NICOLINI et al. v. LUTCHER & MOORE LUMBER CO.

(Circuit Court of Appeals. Fifth Circuit. April 23, 1901.)

No. 936.

SHIPPING—CONSTRUCTION OF CHARTER—TERMINATION.

Under the charter of a schooner, the charterers were to pay a per diem hire for a voyage and return to one of two designated ports. They selected the cargo and the voyage, within certain limits, and paid all expenses except the wages of the master. On the voyage the vessel met with a storm which drove her out of her course, resulted in the loss of a part of her cargo, and compelled her to seek a port of refuge, where the charterers, being involved in a controversy with the insurers of the cargo, ended the voyage, although the vessel, with slight repairs, requiring but a few days, could have proceeded with over half the cargo uninjured. *Held,* that the charter continued in force, and the charterers were liable for the hire of the vessel until her redelivery at the designated port; the delay and abandonment of the voyage resulting from ordinary perils of navigation, of which they assumed the risk, or from their own voluntary action.

Appeal from the District Court of the United States for the Eastern District of Texas.

The appellants, C. Nicolini and M. G. Guerrero, composing the Galveston Export & Import Company, on September 16, 1896, entered into an agreement with C. R. Harms, master of the schooner J. M. McInnis, which recited that the parties (Harms of the first part, and the company, of the second part) "do agree on the chartering of said vessel to the said party of the second part for a voyage from the port of Galveston to any port or ports of the Gulf of Mexico, as the party of the second part may direct, and to return to the port of Galveston or Sabine Pass, at the option of the party of the second part, with the privilege of loading said vessel with any cargo or cargoes of lawful merchandise under or on deck, on the following terms, viz.: First. The said party of the second part, in consideration of the agreements to be kept and to be performed by the said party of the first part, do agree to pay to the said party of the first part the sum of ten ($10.00) dollars, U. S. currency, for each and every day of the period of this charter party, and until the termination of the same. Second. The said party of the second part do further agree to pay all the expenses of the said vessel, of whatsoever nature, during the period of this charter party, including all costs of loading and discharging of cargo and cargoes, port charges, provisions, and crew's wages, excepting only the master's salary. Third. It is further agreed that this charter party shall commence from the said aforementioned date (incl.), September 16th, 1896, and end from and after the release of the said vessel by the custom officials after her return to either of said aforementioned ports, viz. Galveston or Sabine Pass, Texas." The schooner reported on the 15th September without crew or provisions, which were furnished by charterers, who also loaded the vessel with a cargo of 1,460 sacks of corn, a part of which were on deck; and, under orders of the charterers, she set sail from the port of Galveston on September 19th, bound for Vera Cruz, Mexico. On September 23d she encountered a gale, and had to throw 485 sacks of corn overboard and cut away a sail; and she was compelled to change her course and enter a port of refuge (Point Isabel) on September 27th in distress. The master wired appellants September 28th, as follows: "McInnis at Point Isabel in distress. Lost deck load. Some cargo below damaged. Will have to discharge. Noted protest. Wire me your wishes under the circumstances." The next day, September 29th, he again telegraphed: "Corn in hold, steaming. What shall I do? Await your instructions." To which appellants replied the same day: "Prudently do whatever best. Understand from your dispatch cargo practically total loss, about 235 sacks insured on deck." The following day, September 30th, they instructed him as follows: "Surrender cargo to insurance agent,

who will be there. All wet corn positively total loss must be paid by insurance. In event insurance agent refuses to receive cargo there, handle same to best advantage for account whom concerned. Wire amount corn not damaged. Being vessel unfit proceed Vera Cruz, better wire Lutcher Moore, or try get her back here for repairs. Act with prudence, protecting all interests. Vessel being unfit proceed, insurance company should take charge cargo." The master replied the same day that the underwriters refused to take charge of cargo, and would only supervise proceedings so far as their interests required. On October 1st he telegraphed as follows: "Have discharged cargo. Find 750 sacks in good order, 485 thrown overboard, 225 damaged in bad order. Can repair and proceed in five days. Shall I do so, or complete voyage here? Need $300 for expenses, immediate answer." On October 2d appellants wired the master: "Let underwriters' agent take charge of cargo. Your voyage is ended." He answered the next day, October 3d: "Cargo delivered as ordered. Need $110.00 for port charges and expenses. Remit by wire, and instruct whether I shall proceed to Galveston or Sabine Pass." On October 5th he sent this message: "Vessel ready for sea. Am waiting for your orders." To which appellants replied on the 5th: "Peculiarly situated with insurance people regarding giving instructions, but think best for all parties that you return." The master responded on the 5th: "I am governed by charter party, and not interested in insurance. Remit $110.00 for necessary expenses, so I can leave at once." On October 6th appellants sent him the following telegram: "Ask owner's vessel or insurance company funds. Charter party nothing further to do since vessel reached port of refuge." The same day this reply from the master: "You are mistaken. My vessel is under charter to you until arrival at port you name as per charter party. I am not concerned whether cargo is insured. I await your orders." On the 9th they wired him: "Will pay your sight draft for $110.00." He did not draw on them, but paid the expenses himself, and the schooner sailed from Point Isabel on the 12th, arriving at Sabine Pass the 18th, and entering the custom house on the 19th. The libel was filed to recover 34 days' hire of vessel at $10 per day, and wages of crew and other expenses from September 16th to October 19th, both inclusive (34 days); also expense of discharging cargo, pilotage, board of captain and crew, and other expenses after putting into port of refuge, and until the vessel was entered in the custom house at Sabine Pass. The defense was that the charter had terminated when the vessel was unable to proceed on the voyage and bore away from her course in distress into a port of refuge, and that the voyage ended September 30th, when appellants instructed the master to try to get the vessel back to Galveston for repairs. The district court rendered a decree in favor of appellee for the full amount claimed, $576.90, with interest at 6 per cent. from January 1, 1897, to the date of the decree, March 13, 1900, making the sum of $687.45, which it was decreed should bear interest at the same rate from that date, and for all costs, from which decree appellants perfected this appeal.

Jas. B. Stubbs, for appellants.

John C. Walker, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts). This case was not argued orally, but was submitted on briefs mainly devoted to a discussion as to whether the contract sued on was a technical demise of the ship, or a mere charter for the carrying of cargo on a specific voyage. We do not care to add to the literature on this subject by reviewing and distinguishing the authorities cited, as, in our opinion, the case does not require it. Under the contract sued on, the appellants hired the vessel for a voyage and return voyage, as they should direct, from the port of Galveston to any port or ports of the Gulf of Mexico, and they agreed to pay a per diem hire for the use thereof until she should return to either the port of Galves-

ton or Sabine Pass. Under the contract, they not only selected the voyage to be made, but they selected the cargo to be carried. They were at liberty to load the vessel for themselves, or take freight for others on such terms as they should think proper. They were to pay all expenses of the vessel of whatever nature, except the wages of the master. The whole earnings, whether they furnished cargo themselves or took freight for others, were for their use. If the vessel should perform her voyage in a short time, the gain would be theirs; and they would have the same benefit, whether as freight on their own goods or on the goods of others, as if the voyage were unusually prolonged, while the expenses of the ship for wages, provisions, etc., would be reduced. On the other hand, if the voyage should be delayed by adverse winds or any of the other casualties attending navigation, they were to sustain the loss. In no sense whatever was there any agreed or intended common venture between the owners of the vessel and the furnisher of cargo. On the voyage undertaken the vessel met with an ordinary peril of the sea, which resulted in loss of part of the cargo and some of the furniture of the ship. She was driven out of her course, and took refuge at Point Isabel. She was able, with a few days for slight repairs and attention to cargo, to proceed on her voyage with about two-thirds of her cargo undamaged. The appellee, complicated with insurance questions in which the vessel was not interested, saw fit to end the voyage at that port; but ending the voyage at that port did not end the period for which the charterers agreed to pay rent. That period was only to end, under the contract, when the vessel should have returned either to Galveston or Sabine Pass. The case indicates that a speedier return to Port Sabine could have been made if the charterers and master, instead of dealing with each other at arm's length, evidently for fear of waiving supposed rights, had acted together and with promptitude. Taking the case altogether, we see no reason to question the correctness of the decree rendered in the district court, and the same is affirmed.