## THE TERNE.

### BERGEN LLOYD A/S v. MUNSON S. S. LINES.

### No. 11773.

District Court, E. D. New York.

Aug. 29, 1932.

Haight, Smith, Griffin & Deming, of New York City (H. M. Hewitt and Arnold W. Knauth, both of New York City, of counsel), for libelant.

Irving L. Evans, of New York City (Irving L. Evans and John T. Carpenter, both of New York City, of counsel), for respondent.

INCH, District Judge.

Libelant, at the times in question, owned the steamship Terne. It is a corporation existing under the laws of the kingdom of Norway.

On or about December 10, 1928, the respondent, Munson Steamship Line, a corporation existing under the laws of the state of New York, entered into a time form charter party with libelant by which the Terne was chartered.

On January 7, 1929, respondent entered into a special contract or subcharter of the Terne with the Dyal Produce Corporation, by which subcharter the Dyal concern obtained the right to load the Terne, at Prince Edward Island, with Dyal's potatoes. These she subsequently delivered at Cuba.

This special contract called for a lump sum freight to be prepaid by Dyal to respondent. It also contained a provision that it was subject to "ice conditions." The time charter between libelant and respondent contained no such clause.

This voyage of the Terne, however, from Prince Edward Island to Cuba was not without a serious interruption, and it is this fact that brought about, not only this suit between the owner of the ship and respondent, but resulted in litigation between the Dyal Corporation and both these parties. This latter suit was also tried before me. It was decided on May 23, 1932.

In the present trial it was duly agreed that the testimony taken in this Dyal litigation should be considered to be offered in the present case, thus preventing any unnecessary repetition of such evidence and expense.

Accordingly, what happened may be briefly stated as follows: The Terne was at Prince Edward Island ready to take the Dyal potatoes on January 9, 1929. This date was an exceedingly late date for such work in that vicinity. Ice, storms, and difficulty of navigation were reasonably to be expected.

All of the potatoes which, according to the contract, the Dyal Company was to place on board the Terne, had not arrived at that time, and the captain of the Terne reasonably became alarmed at holding her longer at her berth. He notified respondent of his anxiety to get away. However, the respondent, having this special interest in the shipment, and plainly desiring to accommodate Dyal for its own as well as the latter's benefit, in spite of this urgency presented by the captain, directed that the Terne remain and wait for the remainder of the potatoes.

This was done with the result that, when the Terne thereafter sailed, she encountered heavy ice, and, in spite of the exercise of sound judgment on the part of her captain, she was caught in this ice, and so remained for a period of over two weeks. Attempts of the icebreaker Stanley, furnished by the Canadian government on the request of the respondent and also the required technical request of the captain, were of no immediate avail.

The Terne, finally released by the arising of a south wind and under her own steam and with the assistance of the icebreaker, arrived at the port of Sidney. Here, after a few days spent for inspection of cargo, making necessary repairs, etc., she was taken to St. John, where an additional cargo of potatoes was placed on board by Dyal, and she thereafter reached Cuba without further incident.

The amended libel contains two causes of action: First, to recover a sum alleged by libelant to have been wrongfully deducted from the charter hire alleged to be due and also the cost of bunkers; the total claim being $3,899.83. The second cause of action alleges that libelant was compelled to pay approximately $2,700 to the Canadian government for the services of this icebreaker, which sum it was the duty of the respondent to pay, but it declined to do so when called upon, and libelant had been compelled to pay same to obtain the ship's clearance, together with some $1,100 for necessary rudder repairs, frozen pipes, etc. The total amount claimed in the libel is $7,842.84.

At the trial considerable effort was made to convince the court that the respondent had not had proper opportunity to cross-examine witnesses, especially the captain of the Terne. It seems to me that there is no force to this argument. Ample opportunity, which was availed of in some instances, existed, and there is no hardship apparent that has been imposed upon the respondent in this regard.

The respondent sets up a variety of defenses, such as that the Terne was put off hire because of this adventure in the ice; that the Terne was not seaworthy; that the captain did not exercise reasonably sound judgment in his navigation; that the icebreaker was the sole responsibility of libelant, etc.; that the respondent had no responsibility for these repairs, etc.

Suffice it to say that I have carefully considered all these defenses in the light of the testimony.

There is no real dispute as to the facts, nor can there be, it seems to me, any dispute that this whole trouble was caused by the respondent, well aware of the danger, yielding to its own desire and that of Dyal, voluntarily keeping the Terne, against the protests of her captain, at her berth until all of Dyal's potatoes arrived.

This was not an average accident. Barker v. Moore & McCormack Co. (C. C. A.) 40 F.(2d) 410. Nor one giving rise to a general average situation.

The respondent, having deliberately occasioned the delay and the expense, and being the proximate cause thereof, should not

be permitted to thrust this responsibility and liability upon libelant.

The respondent was obligated by its contract to pay for the ship, for each day, from the Terne's delivery, unless excused by provisions in the contract. These exceptions were specifically provided for, and are found in what is commonly known as "break-down clause."

To be sure, it was provided that the vessel shall be "off hire" under certain circumstances, but this inclosure by the ice was not only extraordinary, but was liable to cease at any time within a few hours, should the wind turn to the south. It was this eventual turning of the wind that did release both the Terne and the icebreaker.

The respondent was entitled to collect its freight from Dyal and keep it, and I can see no reason why it should not pay libelant for the hire of the vessel. Wood v. Hubbard (C. C. A.) 62 F. 753; Nicolini v. Lutcher (C. C. A.) 108 F. 550.

The libelant had nothing to do whatever with the arrangements made at Prince Edward Island, and, further, the time at North Sidney, during which the question of additional bunkers and the opportunity to make temporary repairs occurred, was used primarily by Dyal and respondent for examination of the potatoes on the question of their reconditioning. No loss of time was proven. The Santona (D. C.) 152 F. 516.

While there might be, on other facts, some question as to whether the Terne was off hire from February 6, when the injury to its rudder was discovered, until February 9, when Sidney Harbor was reached, there is evidence that this injury to the rudder was not so important as to render the ship "unseaworthy," although making a repair thereto proper. There is evidence that the Terne, at this time, was steering herself.

Twisted rudderstocks do not necessarily prevent proper navigation. In other words, the ship did everything that the respondent required. In my opinion, libelant is entitled to recover the total amount claimed with interest and costs.

If this opinion is not considered a sufficient compliance with the rule 46½ of the Rules in Admiralty (28 USCA § 723), findings of fact and conclusions of law in accordance herewith may be submitted.

Decree for libelant.