BARTLETT ADAMS *et al.*, Appellants, *v.* HENRY A. HOMEYER, Respondent.

1. *Contracts—Boats and vessels—Charter-party—Ownership for the voyage—Owner's lien.*—The owner of a vessel who is also the carrier has a lien upon goods for their transportation, but it does not follow that he who has the title to the property employed in the transportation is necessarily the owner for the voyage. The proprietors of a steamboat or ship, as well as of other property, may lease the same, give up all possession and control, reserving only rent; and in that case the lessee, although the lease assume the form of a charter-party, becomes the owner for the term. The charter-party, instead of a contract of assignment, becomes but a demise; and the temporary owner may carry for others, and they are responsible to him.

2. *Contracts—Boats and vessels—Charter-party, construction of—Possession of vessel.*—The general owner may let his ship with a master and crew of his own choosing, and if there is evidence of intention to part with the possession, it is held to be a demise. But a covenant that he shall have the right to appoint the master to control and navigate, clearly indicates an intention not to trust the property in the hands of others, but to control it by his own agents for the use of the charterers; and he is to be considered as retaining possession.

3. *Contracts—Boats and vessels—Charter-party, terms of, presumed to be known to parties having dealings with the vessel.*—*Semble,* that persons contracting with the charterer of a vessel must be presumed to know the terms of the charter-party.

4. *Boats and vessels—Charter-party—Right of master to freights—Implied contract against consignees who receive goods transported.*—Whatever stipulations may have been made between the consignees of a cargo and the charterer of a vessel which transports them, for the appropriation of the return freights, the right of the master to collect them from the consignees after delivery to them of the goods, at least to the amount due on the charter-party, can not be questioned. The delivering of the goods to the consignees, and their acceptance of them under the bill of lading, raises an assumpsit against them to pay freights according to the stipulations of the bill of lading. And this implied obligation becomes a positive one when the goods are received with notice that the freights must be paid to the master, and not to the charterer.

*Appeal from St. Louis Circuit Court.*

*M. L. Gray*, for appellants.

The suit was based on bills of lading in the usual form, by which the boat was to deliver the goods shipped to defendant's consignee, he paying freight therefor. Defendant, receiving said goods under such bills of lading, was bound to pay the freight thereon. (2 Sumn. 604; Abbott on Shipping, 177–8; 3 Kent, 138; Olcutt's Adm. R. 149; 1 Pars. Mar. Law, 219, ch. 7, § 8.) The main question is, who had possession, command, and navigation of the ship? 1. The owners under the charter-party were in possession to command and navigate the boat, and were entitled to collect the freight as a consequence thereof. 2. If this is not so, the evidence shows that Capelle failed to pay the running expenses of the line, and, by the terms of the contract, plaintiffs were entitled to resume their rights, and did so; by which the owners, and not Capelle, were entitled to the freight earned by the boat on the trip in question.

I. The owners, having their own captain on board, commanding and running the boat, must be considered to be in possession. It is true, Capelle was to pay the rest of the crew; but the crew were under control of the captain, and were bound to obey him. (Abbott on Shipping, *supra*.) The clauses in the charter-party which declare that Capelle shall deliver the boat and barges to the owners, or, in certain events, he shall be relieved from delivering the boat and barges to the owners, must be construed in connection with the one that the owners are to have their own captain to command and run the boat. The whole must be construed together. (1 Pars. Mar. Law, 232–3.) But if there is a doubt which party was to have possession under the charter-party, that doubt must be resolved in favor of the owner. (2 Sumn. 597.) 1 Sumn. 566–9, bears directly on this point. "Where the general owner retains possession, command, and navigation," etc., "the charter-party is considered as a mere affreightment sounding in covenant." (Marcardier v. Chesapeake Ins. Co., 8 Cranch, 49; Gracie v. Palmer, 8 Wheat. 605, 632–3;

3 Kent, 137–8, and note; 2 Brod. & Bing. 434, 440, 443; 1 Johns. 229; 5 Sandf. 97; 1 Paine, 358; 4 Cow. 470; Pars. Mar. Law, 232, ch. 8, § 2; 3 E. D. Smith, 390.)

II. There was evidence showing that Capelle broke his covenants to keep the boat supplied with money to defray running expenses; that he failed to do so. He also failed to pay the hire-money of eighty-five dollars per day, which had become due before the return of the boat to St. Louis. By the terms of the charter-party, a failure to furnish money for the running expenses, or to pay the hire of the boat every fifteen days, gave the owners of the boat a right to terminate the agreement, which they did by notice to Capelle, on the boat's return, about the 6th of November, 1865. Plaintiff's fourth instruction reads as follows: "If performance by Capelle of his covenants in the charter-party would take away the rights of plaintiffs to collect the freight on the goods carried, yet if the court, sitting as a jury, shall find from the evidence that Capelle failed to perform said covenants, and that thereupon plaintiffs notified him and defendants, before the goods were delivered, that the freight must be paid to plaintiffs alone, or their order, then plaintiffs were entitled to collect said freight, and verdict must be for plaintiffs." This instruction should have been given. (4 Barn. & Ald. 630–640 *et seq.*) Defendant, dealing with Capelle, must be presumed to know the terms of the charter-party. (Olcutt's Adm. R. 144–8.)

*Krum & Decker*, for respondent.

Where the owner or freighter leases his vessel and gives control of it, as well as the direction of the voyage the ship shall make, to the party leasing the same, he defraying expenses of navigating the vessel — in such case the hirer becomes the owner for the voyage, and is responsible for the conduct of the master and mariners; and the general owner has no lien for the freight, because he is not the carrier for the voyage. (Abbott on Shipping, 248–289; 3 Kent, 220–1.) The clause giving the owners the right to select the captain to run the steamer and the man to look after the barges, does not conflict with our position,

and can not be construed into a retention on the part of the owners of the possession and control of the boat and barges. It was plainly the intention of the parties that Capelle should have full and complete control of boat and barges, not only from the character of the service in which they were to be employed, but the intention is made more apparent by the clause in the charter-party, by which Capelle agrees to deliver said boat and barges to the owners at the close of the navigable season, etc. Contracts of this sort should be construed liberally, agreeably to the intention of the parties, conformably to the usage of trade in general, and of the particular trade to which they relate. (Abbott on Shipping, 250–274, and cases cited.) As no custom or usage of trade in general or particular is shown, the court must look to the agreement itself to ascertain the intention of the parties. (Drinkwater v. Brig Spartan, Ware, 149 ; Clarkson v. Ellis, 4 Cow. 470 ; Pickman v. Woods, 6 Pick. 248 ; Lander v. Clark, 1 Hall, 375 ; Winsor v. Cutts, 7 Greenl. 261 ; Houston v. Darling, 16 Maine, 413 ; Colvin v. Newberry, 6 Bligh, N. S., 189 ; McIntyre v. Bowne, 1 Johns. 229.) The action and conduct of the parties furnish their own interpretation of the agreement or charter-party. There is no forfeiture shown of the charter-party by reason of any neglect or failure of Capelle. The testimony on this point is balanced, and this court will not, in the absence of proof, assume that Capelle failed to perform his agreement with the plaintiffs, nor does the record show that he desired to forfeit the agreement.

BLISS, Judge, delivered the opinion of the court.

On the 12th of October, 1865, the plaintiffs and one Francis K. Capelle executed a charter-party, of which the following is a synopsis : The plaintiffs charter to Capelle, to run during the balance of the season, upon the Upper Mississippi, the steamer Resolute and three barges ; they agree and claim the right to provide the captain " to command and run " the steamer, and to furnish a man to take charge of and manage the barges, both of whom are to be paid by the plaintiffs. Capelle is to keep sufficient money in the hands of the clerk to pay expenses, which are

to be paid promptly, and no debt for supplies, fuel, wages, or other liabilities against the steamer or barges is to be suffered to accumulate or to remain unpaid. Capelle is to insure the steamer for the benefit of the plaintiffs; is to pay plaintiffs "for the use and hire" of the steamer and barges eighty-five dollars per day, to be paid every fifteen days, until the charter is "terminated by the delivery of said steamer and all of said barges" to the plaintiffs, or until it is otherwise terminated. In case of loss or injury by the dangers of navigation, so as to render the steamer unfit for navigation and render the insurance company liable, Capelle may deliver to the plaintiffs the barges, "pay up the hire of said steamer and barges to the date of said delivery," and be discharged from liability for loss "and for further hire." Upon failure to pay expenses or liabilities of steamer or barges, or to keep it insured, or "to pay the hire" as stipulated, Capelle's rights under the charter are to be forfeited, and plaintiffs may, during the continuance of such failure, terminate the charter "and resume possession of said steamer and barges." Capelle is to deliver them to the plaintiffs at St. Louis, at the close of navigation, in good condition, unless the steamer shall be lost, when "he shall be discharged from all liability to deliver said steamer as aforesaid."

Shortly before the execution of said agreement, Capelle had agreed in writing to transport for defendant a quantity of wheat, at a given price per bushel, from the Upper Mississippi to St. Louis. As soon as he obtained the boat, he sent it above for the wheat—Griffith, the captain, having been placed on board by the owners, according to the charter. Capelle advanced $1,000 to pay expenses, and the evidence tended to show that he agreed to furnish more money at the bridge at the upper rapids, which he failed to do, and the captain drew on defendant for $1,000.50 and for $375; and some bills for coal, etc., were left unpaid. It was also shown that on the arrival of the boat in St. Louis, Capelle came aboard, and Captain Griffith demanded for the owners, under the charter-party, money to pay the hands and the charter hire of the boat, and notified Capelle that unless these sums were paid he would not let the shipment go out of the

owners' hands; but Capelle paid nothing, and thereupon plaintiffs put into the hands of W. B. Russell & Co. the business of delivering the merchandise and collecting the freight for the owners; that defendant paid Russell & Co. some $400, but refused to pay any more, claiming that he had paid the remainder to Capelle in his contract with him. There was also testimony tending to show that Capelle had complied with his contract, and that defendant refused to pay the drafts of the master upon him until authorized by Capelle.

. The plaintiffs claim that they had a lien upon the wheat shipped for defendant for the freight or hire due them, which lien is not affected by the charter to Capelle; also, that the charter was forfeited by his fault, and that he lost all right to collect the freight which he might have possessed under it. That the owner and carrier has a lien upon goods for their transportation is nowhere disputed, but it does not follow that he who has the title to the property employed in the transportation is necessarily the owner for the voyage. The proprietors of a steamboat or ship, as well as of other property, may lease the same, give up all possession and control, reserving only rent; and in that case the lessee, although the lease assumes the form of a charter-party, becomes the owner for the term. The charter-party, instead of a contract of affreightment, becomes but a demise; and the temporary owner may carry for others, and they are responsible only to him.

This subject has been often before the courts of England and of this country, and the various rulings in the former are collected in chapter 2, part 4, of Abbott's Shipping. There does not seem to be perfect clearness and consistency in all the different cases, though, as affecting the question of lien, the above distinction between a demise and contract of affreightment is kept up throughout. Conceding that the owner for the voyage possesses this lien, the same difficulty in the construction of the charter-party has arisen on the American cases. The general owner, unless the contrary appears from the contract, must of necessity be considered the owner for the voyage; but he is competent to part with this ownership temporarily by demise, as well as permanently by absolute sale. In Marcardier v. Chesapeake

Ins. Co., 8 Cranch, I find on page 49 a description of this ownership which is often quoted in other cases: "A person may be the owner for the voyage," says the court, "who, by a contract with the general owner, hires the ship for the voyage, and has the exclusive possession, command, and navigation of the ship. But if the general owner retains the possession, command, and navigation of the ship, and contracts to carry a cargo as freight for the voyage, the charter-party is considered a mere affreightment sounding in covenant, and the freighter is not clothed with the character or legal responsibility of ownership." Who, then, by the charter under consideration, had the exclusive possession, command, and navigation of plaintiffs' boat?

In the construction of contracts of this kind there is nothing peculiar or technical, but, as in all other agreements, the intention of the parties is our polar star; and I confess that the intention in this regard seems more obscure than in any agreement of the kind that has fallen under my observation. I have given a correct abstract of all its provisions, and, while some seem to contemplate a possession by Capelle, others provide that the owners shall retain the possession and navigation. Their right to furnish the captain " to command and run the boat," and the man to take charge of the barges, show that the general owners did not intend to give up the control of their property, and a contrary intention can not be inferred from other parts of the agreement unless it unequivocally appears. Such intention can not be inferred from the fact that they were to receive a per diem for the use of their boat ; for they may have as real a possession while running it in that manner as though receiving pay by weight or measure of the property shipped. Nor can it be inferred from the fact that the charterer is to pay the running expenses, for he may do that and still leave the owner in possession. On the other hand, the peculiarity of the contract in this respect would seem to imply that the charterer was not in possession ; for, instead of a general agreement to pay the expenses, he is not to disburse the money, but is to keep a sufficient deposit with the clerk for that purpose, indicating that it was to be disbursed by those in charge of the boat. Nor can anything be

inferred from the repeated use of the term "hire," for the word may as well apply to the price for services as of a lease.

It is claimed, however, that the different provisions in the charter for delivering up possession to the owners are conclusive upon the question. They are certainly sufficient to throw doubt upon what would otherwise have been perfectly plain; and unless the whole instrument shows that these provisions have another meaning than what alone they would naturally import, we must be compelled to hold that the charterer was to take actual possession. But when we find that the owners covenanted to furnish the men who should command and navigate both the boat and the barges, and when we also find the construction given by the acts of the parties in the fact that the master acted throughout as the agent of the owners in complying with their contract and endeavoring to enforce a compliance with his stipulations by the charterer, all strengthening and supporting the presumption of ownership, we are compelled, if possible, to find some other meaning consistent with the other provisions of the charter and with its practical interpretation.

What, then, must the parties have intended by the language used by them in relation to the surrender of possession at the termination of the contract? Clearly and only that at the time and on the occasions referred to, the contract should end; that the owners should then have the independent use and control, absolved from any obligation to run and carry exclusively for the charterer. This meaning renders the whole instrument, and the action of the parties under it, consistent and harmonious; while the one contended for would require that Capelle, who never was in actual possession, should yield possession to the owners, who had all along, by their own officers, though for Capelle's use, been running the boat and barges.

There are some authorities that seem to support the defendant's view, that the plaintiffs parted with their possession, and hence that they lost their lien for the freight. Halton v. Bragg, 7 Taunt. 14, is no longer considered as authority, and need not be considered. The most favorable American case that I have found is Drinkwater v. Brig Spartan, 1 Ware, 149. By the

charter in that case, the owners let to freight the whole vessel, with appurtenances, the charterers to pay a monthly hire thirty days after the end of the voyage, pay all charges, and deliver her to the owners on her return to port. The owners relied upon the fact that one of them was named in the charter as at present master, as showing that the intention was not to part with the possession; but this master did not sail, and the charterers appointed a new master; and the court held the charter to be a demise, and not a contract of affreightment.

In Pickman v. Wards, 6 Pick. 248, the charterer was held to be the owner for the voyage, principally from the fact that he was allowed to appoint the master. In Lander v. Clark, 1 Hall, 355, the lien for freight is denied upon the ground that "the charter-party was an absolute demise of the ship for the voyage, and transferred the whole ownership of her *pro hac vice* to the charterer;" it appearing that the charterer, and not the owner, appointed the master, and otherwise controlled the ship.

The general owner may let his ship with a master and crew of his own choosing, and if there is evidence of intention to part with the possession, it is held to be a demise. But a covenant that he shall have the right to appoint the master to control and navigate, clearly indicates an intention not to trust the property in the hands of others, but to control it by his own agents for the use of the charterer. Cases seldom turn upon this provision alone, but it must always have great weight in arriving at the intention of the parties in regard to the constructive possession. (See Winsor v. Cutts, 7 Maine, 261; The Schooner Volunteer, 1 Sumn. 551; Certain Logs of Mahogany, 2 Sumn. 582.)

Light may be thrown upon this question by considering the responsibility for loss or damage. Suppose, by the fault of the master, the cargo had been damaged, or a collision had occurred destroying another boat, whose agent would the master have been considered, and who would be compromised by his acts? Would he represent the charterer who had no power over his appointment, or the owners who placed him in command, and who alone had power to keep him or remove him?

The owners, then, should have a lien upon the goods for the

stipulated freight, not to exceed the amount due from the charterer, and not to exceed what the defendants are owing under their freight contract. It is no defense that Capelle was owing them or that they have paid him. They shipped "per steamer Resolute, Griffiths, master," and knew with whom they were dealing, and the rights of carriers. "The respondents must be presumed to know the terms of the charter-party, and that they could not deal with the charterer as owner of the vessel for the voyage, her entire possession and control being reserved to the master and owners." (Shaw v. Thompson, Olcutt's Adm. R. 148.) "Whatever stipulations may have been made between the defendants and the charterer for the appropriation of the return freights, the right of the master to collect them from the consignees after delivery to them of the goods, at least to the amount due on the charter-party, can not be questioned." (*Id.*) "The delivery of the goods to the consignees, and their acceptance of them under the bill of lading, raised an assumpsit against them to pay freight according to the stipulations of the bill of lading. And this implied obligation becomes a positive one when the goods are received, as in this instance, with notice that the freight must be paid to the master, and not to the charterer." (*Id.* 149; see also Faith v. East India Co., 4 Barn. & Ald. 630.) The above quotations from Shaw v. Thompson leave nothing to be said in regard to defendant's liability in this form of action.

But there is evidence showing that defendant has paid various sums, either directly to plaintiffs or upon drafts by the master, amounting to some $1,900, with which he should be credited. Also, there are indications that the $1,000, paid by the charterer upon the running expenses, might have been advanced for that purpose by the defendant. If so, he should also be credited with that sum; for it would be clearly inequitable to refuse to appropriate money advanced for the use of the boat in liquidation of its claims for freight.

The Circuit Court, in its instructions to the jury, took a different view of the questions discussed in this opinion, and its judgment is reversed and the cause remanded. The other judges concur.