Argued 11 October, decided 27 November, 1905.

## GRIMBERG *v.* COLUMBIA PACKERS' ASSOC.

83 Pac. 194.

SHIPPING — PRESUMPTION AS TO NATURE OF CHARTER.

1. A charter party is presumptively a contract of affreightment rather than a demise of the ship, and will be so construed unless its terms indicate clearly to contrary.

CHARTERS — GENERAL RULE OF CONSTRUCTION.

2. Charter parties are subject to the same rules as are other contracts, and the intention of the parties must control, when ascertained.

CHARTERS — DEMISE OR CONTRACT FOR SPECIAL SERVICE.

3. Where a charter party transfers to the charterer the entire command, possession and control of the vessel, the charterer is owner for the service stipulated for ; but where a charter party is merely an agreement for the use of the vessel, the general owner at the same time retaining command, possession and control over her navigation, the charterer is a contractor for the specific service, and the responsibilities of the owner are not changed.

MEANING OF "FREIGHTING" IN SHIPPING CHARTER.

4. The word "freighting" in a charter party, whereby the owner of a vessel agrees on the "freighting" and chartering thereof to the charterer for a voyage, means a loading with goods for transportation, and does not indicate a demise of the vessel to the charterer.

MEANING OF "CHARTERING" IN SHIPPING CHARTER.

5. The word "chartering," in a charter party whereby the owner of a vessel agrees on the freighting and "chartering" thereof to the charterer for a voyage, does not necessarily mean a letting of the vessel by way of demise, but is equally consistent with the idea of a contract of affreightment,

47 OR. —— 17

CONSTRUCTION OF STIPULATIONS IN CHARTER.

6. A charter party binding the owner to keep the vessel during the voyage well fitted, tackled, etc., giving the charterer the sole use of the vessel, except the private apartments of the master in the cabin, and providing that no goods shall be laden on board, except for the charterer, gives the owner an oversight over the vessel during the voyage, and binds him to freighting her, and is therefore inconsistent with the idea of a demise of her to the charterer.

IDEM.

7. A provision in a charter party, whereby the charterer covenants to charter and hire a vessel and to pay for the charter, including the captain's salary, during the voyage, a specified sum on the acceptance of the vessel and a specified sum per month until the vessel is discharged of her cargo, is not inconsistent with a contract of affreightment only, where the provision is contained in a covenant on the part of the charterer, and the owner has not on his part employed any words operative as a demise.

IDEM.

8. A charter party contained no technical words of demise, nor was the vessel let to hire. The charterer covenanted to "charter and hire." The owner provided the master. The charterer engaged the crew and bound himself to pay all port charges and labor bills and provisions during the voyage, and to "deliver" the vessel in port of destination to the owner, and agreed to employ the vessel only in lawful trade. The master's wages were included in monthly payments to be made for the charter. The first payment was to be made on the day of the "acceptance" of the vessel by the charterer. The owner agreed to place the vessel at a wharf selected by the charterer, at which time, the vessel being safely moored, the charter should "commence," and if the vessel was not so delivered the charterer might cancel the charter. *Held* that, though the words "charter and hire" and "acceptance" and "deliver" indicated a demise, they were not inconsistent with a contract of affreightment merely, and in view of the absence of words of demise and the presumption against a demise the charter party must be construed as one of affreightment only.

## From Clatsop: THOMAS A. MCBRIDE, Judge.

Action by Charlotte Grimberg, administratrix of Emanuel Grimberg, deceased, against the Columbia River Packers' Association. Plaintiff sues to recover damages for the death of Emanuel Grimberg, alleged to have been caused caused through the negligence of the defendant. It is alleged that Grimberg was in the employ of the defendant in the capacity of a sailor on the vessel St. Nicholas, under charter from George W. Hume & Co., of San Francisco, who, being ordered aloft, obeyed, but that, while in the rigging of the vessel, and using a becket on the mizzen topgallant yard, it gave way, whereby he was precipitated to the deck of the vessel, sustaining injuries from which he died. The alleged carelessness consists in allow-

ing the becket to become unsafe and insecure. The accident is alleged to have happened on the ship's homeward voyage from Nushagak Harbor, Alaska, to the port of Astoria, Oregon. When plaintiff concluded her evidence at the trial, the defendant moved for a nonsuit, which being granted, the defendant had judgment, and plaintiff appeals.                                    AFFIRMED.

For appellant there was a brief over the names of *F. D. Winton* and *Noland & Smith*, with an oral argument by *Mr. George Noland.*

For respondent there was a brief over the name of *Fulton Bros.*, with an oral argument by *Mr. George Clyde Fulton.*

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

From the allegations in the complaint the accident must be deemed to have happened upon the high seas, for the vessel was on her homeward voyage from her port of destination in Alaska to her port of final discharge in Oregon. The theory of plaintiff is that defendant was the owner of the vessel pro hac vice for the voyage, and, therefore, being in possession and command, was responsible for the accident and liable in damages for the injury sustained. The defendant combats the proposition, and contends that the liability is with Hume & Co., the general owners of the vessel. It is practically conceded by appellant's counsel that, unless the defendant was the lessee of the vessel St. Nicholas, under a demise from the owner, it is not liable for the damages sustained. Whether, therefore, the charter party between Hume & Co. and the defendant, touching the navigation of the vessel, constitutes a demise thereof, or is a mere contract of affreightment, is at the outset a material, if not the vital, question for our consideration.

The charter party was made and concluded in San Francisco between George W. Hume & Co. of the first part and

the Columbia River Packers' Association of the second part. The following is an abstract of the provisions of the charter party, material for our purpose, viz.: That the party of the first part "does covenant and agree on the freighting and chartering of the said vessel unto" the second party "for one voyage from the port of San Francisco, California, with option via Astoria, Oregon, to Nushagak Harbor, Bristol Bay, Alaska, and thence to Astoria or Puget Sound, final port of destination," and "does engage that the said vessel, in and during the said voyage, shall be kept tight, staunch, well fitted, tackled, and provided with every requisite necessary for such a voyage. That the whole of such vessel, except the private apartments of the master in the cabin, and his navigation room, and necessary room on the ship for sails and necessary extra tackle, shall be at the sole use and disposal of the" second party "during the voyage aforesaid; and that no goods or merchandise whatever shall be laden on board otherwise than for said party of the second part or its agent without its consent." That the second party "does covenant and agree * * to charter and hire said vessel as aforesaid," and to pay "for the charter of said vessel, including the captain's salary, during the voyage aforesaid" $1,500 "on the day of acceptance of said vessel alongside of the wharf in San Francisco, and thereafter fifteen hundred dollars monthly in advance and pro rata for fractional part of a month, until said vessel is discharged of all her cargo in Astoria, Oregon, or Puget Sound, the final port of destination. It is further agreed" that the second party "shall pay all wages of crew (excepting captain) and all port charges and labor bills from the date this charter party commences, and to furnish all necessary provisions, fuel, water, and lights during the whole of said voyage, and at the termination of this charter to deliver the said vessel in port of Astoria or Puget Sound to the" first party "in as good condition (reasonable wear

and tear excepted) as she is at the commencement of this
charter, dangers of the sea and navigation, and acts of
God and the elements, and fire excepted," and that it will
"employ said vessel only in lawful trade, and no goods or
merchandise shall be laden on board thereof for the pur-
pose of unlawful trading." That the first party "will place
the aforesaid vessel, with swept hold ready for cargo * *
alongside of such safe wharf in San Francisco as the party
of the second part may direct, * * at which time, said
vessel being safely moored, said charter shall commence,"
but that, if "said ship shall not be delivered to the party
of the second part in the manner and at the time desig-
nated, then the party of the second part may at its option
cancel this charter"; and that, "in case the said vessel be
lost or wrecked," the second party shall pay to the first
party "the freight under this charter up to the day the
said vessel is lost or wrecked, and in case the said vessel
shall return to this, or any other port, unable to complete
the said voyage, this charter shall cease and terminate."
The second party further agrees that "on the delivery of
said vessel at the termination of the charter she shall be
clear and free of any liens for services performed to or on
board the same, and for materials furnished. Payments
for services or materials are by this charter party required
to be made by the party of the second part. That she shall
be free from all or any claims or demands or liens for
breach of passengers or carrying contract, unless the dam-
ages caused shall be by reason of the unseaworthiness of
the vessel, but not otherwise," and that the second party
shall "at all times have enough men aboard to properly
care for ship and her safety." That the first party "shall
furnish and supply said ship with sufficient tackle, gear,
and falls to handle cargo, and necessary lines for moor-
ings."

1. The question presented arises almost wholly upon a construction of the charter party for there are but few extraneous facts that shed any light upon the subject, which is whether the agreement constituted a demise of the vessel to the defendant or was merely a contract of affreightment, the general owners retaining the control, management and navigation thereof. It is well to observe at the outset that the presumption primarily is against a demise, and the contract is to be construed as one for an affreightment, unless the terms show a clear intendment to the contrary. Say the learned authors of the American and English Encyclopædia of Law (2 ed.), vol. 7, p. 167: "The presumption is that the ownership of the vessel, even during the period covered by the charter party, continues in the general owner; and, unless the intention to transfer the possession and ownership to the charterer is unequivocally manifested by the contract, a charter party will not be treated as a lease or demise of the ship, but will be treated as a contract of affreightment." So, in *Reed* v. *United States*, 78 U. S. (11 Wall.) 591, 601 (20 L. Ed. 220), Mr. Justice CLIFFORD, says: "Courts of justice are not inclined to regard the contract as a demise of the ship, if the end in view can conveniently be accomplished without the transfer of the vessel to the charterer, but where the vessel herself is demised or let to hire, and the general owner parts with the possession, command, and navigation of the ship, the hirer becomes the owner during the term of the contract, and, if need be he may appoint the master and ship the mariners, and he becomes responsible for their acts." The burden, therefore, lies with the plaintiff to overcome this presumption.

2. About the only extraneous evidence, important to the inquiry, is that the decedent was employed by the defendant at Astoria, Oregon, in the capacity of a sailor on the voyage, and others were so employed by defendant for a

like service; that they shipped on the vessel at Astoria; that there were three mates in the service of the ship; and that the second mate directed the deceased to go aloft, which order being obeyed, he met with the mishap in question, causing his death. Aside from the bearing this evidence may have as showing what was done in pursuance of the charter party, the instrument itself must be construed as other contracts, and, when the true intendment of the parties is ascertained, it must prevail. We should keep in mind, however, the presumption applicable, so that the doubt, if one exists, may be resolved in favor of a contract of affreightment, rather than a demise of the vessel. See, further, *Adams* v. *Homeyer*, 45 Mo. 545 (100 Am. Dec. 391); and *Certain Logs of Mahogany*, 2 Sumn. 589 (Fed. Cas. No. 2559).

3. The general rule of construction relating to the charter party is that if the vessel, the subject of the agreement, be let so that there is a transfer or relinquishment to the charterer of the entire command, possession and subsequent control, he will be treated as owner for the time being, that is, for the voyage or particular service stipulated for. However, if the charter party is but an agreement or covenant for the use of the vessel or some designated part thereof, the general owner at the same time retaining command, possession and control over its navigation, the charterer must be regarded as a contractor only for a designated or specific service, which does not alter the duties and responsibilities of the owner. In the one case the charter party operates as a lease or demise of the vessel, whereby the lessee assumes the duties and liabilities in a large measure, at least, of the owner; while in the other the agreement is for a special service to be rendered by the owner of the vessel: *Reed* v. *United States*, 78 U. S. (11 Wall.) 591, 601 (20 L. Ed. 220). "All the cases agree," says Mr. Justice Field, in *Leary* v. *United States*,

81 U. S. (14 Wall.) 607, 611 (20 L. Ed. 756), "that entire command and possession of the vessel, and consequent control over its navigation, must be surrendered to the charterer before he can be held as special owner for the voyage or other service mentioned." "But," says Mr. Justice STORY, in *Marcardier* v. *Chesapeake Ins. Co.*, 12 U. S. (8 Cranch), 38, 48 (3 L. Ed. 481), "where the general owner retains the possession, command, and navigation of the ship, and contracts to carry a cargo on freight for the voyage, the charter party is considered as a mere affreightment, sounding in covenant, and the freighter is not clothed with the character or legal responsibility of ownership." See, also, *United States* v. *Shea*, 152 U. S. 179 (14 Sup. Ct. 519, 38 L. Ed. 403); and *Emery* v. *Hersey*, 4 Greenleaf, 404 (16 Am. Dec. 268). So that the distinguishing feature between a demise of the ship, whereby the legal responsibilities of ownership are transferred to and assumed by the charterer, and an agreement for affreightment, is clear, and the main difficulty lies in determining what the parties intended by the charter party, considering the language in which it is clothed.

4. The first clause of the charter party consists exclusively of words of covenant, and not of demise. They are that the first party "does covenant and agree on the freighting and chartering of the said vessel unto" the second party "for one voyage." "Freighting" signifies a loading with goods or other commodities for transportation: Webster's Dictionary.

5. The word "chartering" does not necessarily mean a letting of the ship by way of demise, and is equally as consistent with the idea of a contract for affreightment: *Ross* v. *Charleston M. & S. Transp. Co.*, 42 S. C. 447 (20 S. E. 285).

6. Following this are engagements of the first party in two clauses—the first to the effect "that the said vessel,

in and during the voyage, shall be kept tight, staunch, well fitted, tackled," etc.; and the second that "the whole of such vessel, excepting the private apartments of the master in the cabin," etc., "shall be at the sole use and disposal of the" second party during the voyage, and that no goods "shall be laden on board otherwise than for said" second party. These contain cogent and forcible expressions indicating that an affreightment only was intended, and not a demise. They imply, first, that the owners shall have an oversight of the ship to see that it be kept in proper condition during the voyage, and, second, that they should engage in freighting the vessel, consistent with the previous clause, agreeing that no goods should be laden thereon except such as the charterer should designate. The engagements are simply what they purport to be, covenants on the parts of the owners, and are inconsistent and incompatible with the idea of a demise: *Leary* v. *United States*, 81 U. S. (14 Wall.) 607 (20 L. Ed. 756).

7. We come, now, to the next clause, which consists of stipulations on the part of the defendant. It reads, in effect, that the second party "does covenant and agree to charter and hire said vessel," and "to pay for the charter of said vessel, including the captain's salary, during the voyage," $1,500 on the day of acceptance of the vessel, and $1,500 per month, until "said vessel is discharged of all her cargo." The clause runs in covenant and agreement by its direct terms; that is to say, it is a covenant to charter and hire, and to pay the stipulated sum of $1,500 per month for the charter. The use of the term "hire," like the word "charter," is not inconsistent with the idea of a covenant or agreement only for freighting accommodations aboard ship. Says Mr. Justice Bliss, in *Adams* v. *Homeyer*, 45 Mo. 545 (100 Am. Dec. 391): "Nor can anything be inferred from the repeated use of the term 'hire,' for the word may as well apply to the price for service as of a lease."

But, in the connection in which the word is used in the present instance, the inference would be rather against the signification of a leasing, for it is contained in a covenant on the part of the charterer, while the owners have not on their part employed any terms which are ordinarily considered operative words in a lease or demise. But these clauses, considered simply in their relations one to another, are not controlling, but may yet be dominated and their true intendment governed by subsequent conditions of the charter party. In *Marcardier* v. *Chesapeake Ins. Co.* 12 U. S. (8 Cranch), 38 (3 L. Ed. 481), the charter party contained this language: "Granted and to freight let, * * the said brig, excepting and reserving her cabin for the use of the master." And by the first clause in the case of *Clarkson* v. *Edes*, 4 Cowp. 470, the owner agreed "to freight and to let" to the charterer the whole of the ship, and yet it was held in each of those cases, considering all the terms of the charter party, that the ownership and possession was retained by the general owner. Here were positive terms used, strongly indicative of an intendment that the ship should pass to the charterer under a demise.

8. The first payment in the present charter party was to be made on "the day of the acceptance" of the vessel by the charterer. The word "acceptance" has a significance that we will discuss presently. By succeeding clauses it was agreed that the charterer should pay all wages of the crew, excepting the captain, all port charges and labor bills, and furnish all necessary provisions, fuel, etc., during the whole of the voyage, and should at the termination of the charter deliver the vessel in port of destination to the owner in as good condition as when chartered, reasonable deterioration for usage excepted, and that it should "employ" the vessel only in lawful trade. These clauses certainly militate strongly against the idea of a contract of affreightment, for the charterer has taken upon him-

self the entire expense of the voyage, except the wages of the captain, which are provided for in the consideration for the charter of the vessel. In other words, the captain's wages were included in the monthly payments to be made for the charter. Who were to furnish the crew we are not advised. By all reasonable intendment the owners were to furnish the captain or master, for why should they provide for the payment of his wages along with the consideration for the charter of the vessel? If the charterer was to provide such master, it would be a matter of indifference with the owners respecting the payment of such wages, except that they would probably have required a stipulation on the part of the charterer, as they have with reference to the wages of the crew, that such wages should be discharged, so that they would not become a lien upon the ship. From evidence aliunde we know that the decedent and others were employed by defendant to ship as sailors for the voyage. But there were mates aboard who undoubtedly participated in the navigation of the ship, and we are unadvised as to who furnished or employed them, the owners or the charterer. Their wages were to be paid by the charterer. The provisions touching the expense of the voyage are certainly largely inimical to the idea of a contract of an affreightment only: *Drinkwater* v. *Freight and Cargo of the Brig Spartan*, 1 Ware, *149, (Fed. Cas. No. 4085); *First Nat. Bank of Marquette* v. *Stewart*, 26 Mich. 84. So it would seem, as to the agreement on the part of the charterer, that it should employ the vessel only in lawful trade.

The word "employ" indicates a purpose of control and management. Yet the defendant might reasonably have made such a covenant without taking a demise of the vessel. The covenant or agreement is perhaps common to most charter parties. By a subsequent clause the owners agreed to place the vessel, ready for cargo, alongside

of such wharf in San Francisco as the charter might direct, at which time, the vessel being safely moored, the charter should "commence," but that, if the ship should not be "delivered" in the manner designated, then that the charterers might at their option cancel the charter. Then later in the agreement the charterer stipulates that "on the delivery of said vessel at the termination of the charter she shall be free and clear of any liens," etc.   The use of the terms "acceptance" and "delivery" with relation to the ship would seem almost conclusively to indicate an intendment that the command and possession were surrendered to the charterers, to be by them delivered back to the owners at the termination of the voyage, and would evidence a demise, and yet not a single technical term of demise, and no other term of such significance that could not as well be used in draughting a contract of affreightment, is employed in the charter party between the parties. The mere circumstance that such terms were not employed is in itself significant. There are some other provisions of minor moment, namely, that the charterer shall, in case the vessel is disabled for service or lost, pay "freight" to the time of such disablement or loss only, the charter terminating by the event ; that the charterer shall at all times have men on board sufficient properly to care for the ship and her safety, and that the owners shall supply the ship with tackle, etc., to handle cargo, and necessary lines for mooring. These are not inconsistent, either with the demise of the vessel or a contract of affreightment, and may as well be employed in the one case as in the other. We will recur, therefore, to a further consideration of the preceding conditions touching the acceptance and delivery and redelivery of the vessel.

In the case of *Adams* v. *Homeyer*, 45 Mo. 545 (100 Am. Dec. 391), there arose very much such a conflict of inconsistent clauses in the charter party as here, and the court

gave them most careful and intelligent consideration, resulting in the conclusion that the charter party did not effectuate a demise of the vessel. There is a significant distinction in one respect only. In that case the owners agreed and claimed the right to provide the captain "to command and run the steamer, and to furnish a man to take charge of and manage the barges, both of whom were to be paid by the plaintiffs." While the owners here do in fact provide the captain or master, and pay his wages, nothing is said regarding his command or control of the vessel. Beyond this the charterer was to insure the steamer for the benefit of the owners and pay them "for the use and hire" of the boat and barges a stipulated sum every 15 days, "until the charter was terminated by the delivery of said steamer and all of the said barges to the owners," or until otherwise terminated. In case of loss or disablement of the boat, it was further agreed that he might deliver the barges to the owners, "pay up the hire of said steamer and barges to the date of such delivery," and be discharged from liability or loss and "for further hire"; that upon failure on the part of the charterer to pay expenses or liabilities of steamer or barges, or to keep the former insured, or to "pay the hire," his rights were to be forfeited; that the owners might terminate the charter and "resume possession of the steamer and barges"; and that in case of loss of the steamer the charterer should "be discharged from all liability to deliver said steamer as aforesaid." After speaking of the effect of other clauses of the charter party, all supporting the presumption of ownership in the general owners, the court say: "What, then, must the parties have intended by the language used by them in relation to the surrender of possession at the termination of the contract? Clearly and only that, at the time and on the occasion referred to, the contract should end; that the owners should then have the independent use and control, absolved from

any obligation to run and carry exclusively for the charterer. This meaning renders the whole instrument, and the action of the parties under it, consistent and harmonious; while the one contended for would require that Capelle, who never was in actual possession, should yield possession to the owners, who had all along, by their officers, though for Capelle's use, been running the boat and barges." A little later the court continues: "The general owner may let his ship with a master and crew of his own choosing, and, if there is evidence of intention to part with the possession, it is held to be a demise. But a covenant that he shall have the right to appoint the master to control and navigate clearly indicates an intention not to trust the property in the hands of others, but to control it by his own agents for the use of the charterer."

Now, as previously observed, the parties have employed no technical words of grant or demise, nor was the vessel, in terms, let to hire. The charterer covenanted and agreed to "charter and hire," but we look in vain for any letting to "hire" on the part of the owners, nor was there any express declaration that the charterer was to take the vessel into its own possession. The owners provided the master and presumably the mates, while the charterer engaged to employ the crew. The natural deduction would be that the owners retained command and possession and the consequent navigation of the vessel through the master and mates. So that here are conditions altogether incompatible with any idea of a demise whatever, and, while the term "hire" might be consistent with a demise, it is not inconsistent with a contract of affreightment. The clause with reference to the charterer's payment of the wages of the crew, etc., is, however, consistent with a demise, yet it is not controlling. So, with the stipulations concerning acceptance, delivery and redelivery, considering the other conditions of the charter party. These terms are more

readily reconcilable with the idea of their employment with reference to the commencement and termination of the charter party than that they portend a transfer of the possession, control and management of the ship from one party to the other.

These considerations, taken in connection with the legal presumption that obtains in favor of the continuance of ownership of the ship in the general owners, and against any transfer thereof for the voyage, impel us to the conclusion that the contract is one of affreightment only, and does not constitute a demise. The presumption alluded to is said to be so strong that, if the end sought to be affected by the charter party can conveniently be accomplished without a transfer of the vessel to the charterers, the law is not disposed to regard the contract as a demise; and this, even if there be express words of grant in the formal parts of the instrument: *Hagar* v. *Clark*, 78 N. Y. 45. No such words whatever are found in the present charter party.

Such being our conclusion, it is conceded that the defendant is not liable for the injury resulting to the decedent, and the judgment of the circuit court will therefore be affirmed.                                    AFFIRMED.