Argued October 10, decided November 7, 1911.

## ADAMS *v.* CAREY.

[118 Pac. 553.]

SHIPPING—CHARTERS—CONSTRUCTION AND OPERATION.

1. A charter party is to be construed so as to effectuate the intention
of the parties, which is to be determined from the whole instrument.
The presumption is against a demise, but that the ownership of a vessel
during the period of the charter party continues in the general owner;
and, unless the intention to transfer the possession and ownership to the
charterer is unequivocally manifested by the contract, the charter party
will not be treated as a lease or demise of the vessel, but will be treated
as a contract of affreightment.

SHIPPING—CHARTERS—DEMISE OR CONTRACT OF AFFREIGHTMENT.

2. Where a tug was "chartered and let" for towage to proceed to a
certain port to take a tow for San Francisco, "and thereafter is to perform
such duties in accordance with the terms of this agreement as may be
required of her by the said charterers," and the charter party provided
that all expenses, supplies, and wages of crew should be borne by the
owners, who were to keep the tug in good condition for towage, and the
tug remained in command of the owners' master, to whom the details of
navigation were left and who was the owners' agent and responsible to
them, the charter party did not effect a demise of the tug, but was a
mere contract of affreightment.

SHIPPING—CHARTER OF TUG—DAMAGES TO TOW—LIABILITY.

3. Under a charter party stipulating that all risks or damages to tows, docks, etc., not arising through the negligence of the ·owners, or not covered· by the insurance on the tug chartered, and for which the owners of the tug would be liable, were expressly assumed by the charterer who released and discharged the owners from any claims for liability arising from such negligence, and agreed to hold them harmless therefrom, the risks or damages assumed by the charterer do not extend to those arising through the negligence of the owners.

SHIPPING—CHARTER OF TUG—DEDUCTION ON ACCOUNT OF DAMAGES PAID.

4. A charterer of a tug, who was not liable under the terms of the charter party for damages to tows, due to the negligence of the tug, paid to the owner of the tow, to whom he was responsible, a sum in settlement of damages to the tow from the negligence of the tug, in order to prevent a threatened libel and delay of the tug. *Held,* in the owners' action for compensation, any defense they might have to the claim of damages to the tow from their negligence could be made in the action, and that the charterer had a right to pay any such damages for which the owners were primarily liable, and that to the extent of the owners' liability the damages so paid would be allowed against the compensation.

SHIPPING — COMPENSATION — DAMAGES TO TOW — PARTIES WHO MAY CLAIM DAMAGES.

5. Where a tug is chartered for towage to a party who is not the owner of the tow, nor liable under the charter party for damages thereto from negligence of the tug, either the charterer or the owner of the tow may recover for such damages; and a recovery by the owner of the tow, or an allowance to the charterer in an action for compensation, is a full satisfaction and a bar to any subsequent action by the other.

SHIPPING—ACTION FOR COMPENSATION—AMOUNT.

6. Under a charter party which provided that the charterer of a tug shall pay at the rate of $200 per day, and that if the charterer had no active use for the tug, and did not make use of her, a rebate of $50 per day should be allowed upon such price during the time when she was idle, but that no such rebates would be allowed for less than a full day, the idle time to be determined from the tug's log, the charterer was entitled to a rebate of $50 per day for such time as the tug's log showed that she had not been in use during any 24 consecutive hours, and that, if on account of the failure of the owners to have the tug staunch and fitted for the service contemplated by the agreement, and by reason of the owners not supplying a competent crew, or by reason of the improper management of the tug, or by the want of reasonable diligence on the part of the crew, the tug was not at the disposal of the defendant on any day, days, or parts of days, he was entitled to a deduction of $200 per 24 hours for so much of that time as the tug was not at his disposal.

SHIPPING—ACTION FOR COMPENSATION—BURDEN OF PROOF.

7. In an action by the owners of a tug for compensation under a charter party, which provided that the tug should be tight, staunch, and

in every way fitted for use as a vessel engaged in the business of towing lumber to be shipped to certain ports on the Pacific Coast, the burden of proving that the tug was tight, etc., was upon the plaintiff.

From Multnomah: WILLIAM N. GATENS, Judge.

Statement by MR. JUSTICE BEAN.

This is an action by C. F. Adams and A. C. Mills against F. W. Carey, doing business under the firm name and style of F. W. Carey & Company, to recover $4,500, balance due for services of the tug Sampson. Upon the trial there was a verdict and judgment of $3,368.45 for plaintiffs, and defendant appeals.

The agreement under which the tug Sampson performed towing for defendant is set forth in the complaint as follows:

"This charter party, made and concluded upon in Portland, Oregon, this 29th day of September, 1906, by and between C. F. Adams and A. L. Mills, parties of the first part, owners of the tug Sampson, of Portland, Oregon, now lying in the harbor of Portland, and F. W. Carey & Company, of San Francisco, California, parties of the second part, witnesseth:

"1. The said vessel is chartered and let by said parties of the first part to said parties of the second part for a period of two weeks beginning at twelve-thirty o'clock A. M. on the morning of the 2d day of October, 1906, for use in towing to and from the Columbia River, Coos Bay and San Francisco, and is to proceed at once to Knappton, Washington, to be ready there to tow a vessel to San Francisco, California, and thereafter is to perform such duties in accordance with the terms of this agreement as may be required of her by the said charterers.

"2. The parties of the second part agree to pay and the parties of the first part agree to receive for the use of said vessel the sum of two hundred dollars ($200.00) per day during said period; provided, however, that if during said period said parties of the second part have no active use for said vessel and do not make use of her, a rebate of fifty dollars ($50.00) per day shall be allowed upon said price during the time when she lies idle, no such

rebate being allowed, however, for less than a full day, the idle time to be determined by the log of the tug; one thousand dollars ($1,000.00) on this charter party to be paid on signing this agreement and the balance on the expiration of the time.

"3. That said vessel be tight, staunch, strong, and in every way fitted and provided for use as a vessel engaged in the business of towing lumber and other ships from and to ports on the Pacific Coast before mentioned.

"4. It is agreed that said vessel shall at all times during the period of this charter be subject to the directions of the parties of the second part, and shall go and come between the ports and places before mentioned and shall tow such vessels as shall be indicated by said second party.

"5. At the end and within said period of this charter, the said vessel shall be returned to Portland, Oregon.

"6. All expenses of fuel, supplies, wages of the crew, and other expenses shall be borne by the parties of the first part and the said parties of the first part shall keep said vessel at all times fully furnished and in good condition to perform the duties as aforesaid.

"7. All risks or damages to tows, cargo or docks, marine or otherwise, not arising through the negligence of the owners or not covered by insurance on the tug chartered and for which said first parties of said tug would be liable are hereby expressly assumed that (by) the second parties, and the first parties and the said tug are hereby released and discharged from any and all claims for liability arising or to arise on account thereof, and the second parties agree to hold the said first parties and the said tug harmless therefrom; provided that for any accident to the tug the second parties shall not be liable."

The agreement was signed and sealed on the 29th day of September, 1906.

Plaintiffs allege that pursuant thereto, on the 2d day of October, 1906, plaintiffs delivered to defendant the tug Sampson in the required condition, and in all things performed such agreement on their part. Defendant returned the tug December 11, 1906.

The defendant admits the making of the agreement, and by way of counterclaim pleads:

1. That he lost the use of the vessel for 25 days owing to improper management and the poor condition of the tug.

2. That he advanced, for the payment of expenses and wages, the amount of $431.55.

3. That, for the period of 11 days, he had no use for the tug, and, as provided by the agreement, was entitled to a rebate of $550.

4. That on October 2d the tug did not proceed to Knappton, Washington, where it was agreed she should go, and that he was damaged to the extent of $300, demurrage on the tow Barkentine Northwest, then at Knappton.

5. That by the carelessness and negligence of the plaintiffs the tug was made to collide with the schooner Louis at Knappton, Washington, on November 14, and again on November 22, 1906, in the harbor of San Francisco, while the tug Sampson was towing the schooner Louis; that the said tug was, by the negligence of the plaintiffs, so carelessly operated that it again fouled and collided with the Louis, and swung said tow against the Clan Galbraith, an English vessel then lying at anchor in the harbor; that the Louis at that time was, and now is, owned and operated by the Simpson Lumber Company, a corporation, but was under his care and charge, and he was responsible for her safe towage and delivery at her destination. Both the schooner Louis and the Clan Galbraith were damaged, and the Simpson Lumber Company was compelled to and did pay out on account thereof for repairs to the said vessels, $6,769.79, and threatened to and would have libeled the tug Sampson for that amount and caused her arrest and sale, thereby depriving defendant of the use of said vessel for a long time to his great damage. In order to prevent the same and protect himself on his liability to the Simpson Lumber Company,

he was compelled to and did effect a compromise and settlement with the aforesaid company, in behalf of the tug Sampson and its owners, and to protect the tug and the defendant's charter and to pay for such damages of said schooner, upon such settlement, paid to said Simpson Lumber Company the sum of $2,100.

Plaintiffs by their reply admit that defendant did not have the use of the tug for seven days, while it was undergoing repair, and that the log of the tug Sampson showed that defendant failed to use said tug for six days, entitling him to a rebate of $50 per day. They admit the $431.55 advanced for supplies and paid to the crew, but deny the alleged damages, and deny liability for the damages.

REVERSED.

For appallant there was a brief over the names *Messrs. Carey & Kerr,* and *Mr. Omar C. Spencer,* with oral arguments by *Mr. Charles H. Carey* and *Mr. Spencer.*

For respondents there was a brief over the names of *Messrs. Teal, Minor & Winfree,* with an oral argument by *Mr. A. B. Winfree.*

MR. JUSTICE BEAN delivered the opinion of the court.

Upon the trial, the court sustained the objection of plaintiffs to the evidence offered by defendant as to the damages paid by defendant to the owners of the schooner Louis. Upon the part of plaintiffs, it is contended that the contract entered into between the parties constituted a demise of the tug Sampson to defendant, Carey, and made him the owner *pro hac vice.* On the other hand, the defendant contends that the contract was one of towage or affreightment, and therefore the court erred in rejecting the evidence of the claim of defendant for damages caused by the negligence of plaintiffs and their employes. This is the main question in the case, and depends upon the construction of the charter party.

1. There is nothing peculiar or technical in the construction of this kind of contracts. As in all other agreements, the intention of the parties is the point to be aimed at. This should be determined from the whole instrument. Primarily the presumption is against a demise, and that the ownership of the vessel during the period of the charter party continues in the general owner; and, unless the intention to transfer the possession and ownership to the charter is unequivocally manifested by the contract, the charter party will not be treated as a lease or demise of the ship, but will be treated as a contract of affreightment. *Grimberg* v. *Columbia Packers' Association,* 47 Or. 257 (83 Pac. 194: 114 Am. St. Rep. 927), 7 Am. Eng. Enc. of Law (2 ed.) 167.

In *Marcardier* v. *Chesapeake Insurance Company,* 12 U. S. (8 Cranch) 39 (3 L. Ed. 481) a case which is often quoted as to ownership, it is said:

"A person may be the owner for the voyage, who, by a contract with the general owner, hires the ship for the voyage, and has the exclusive possession, command, and navigation of the ship. * * But where the general owner retains the possession, command, and navigation of the ship, and contracts to carry a cargo of freight, for the voyage, the charter party is considered as a mere affreightment, sounding in covenant, and the freighter is not clothed with the character or legal responsibility of ownership."

In *Leary* v. *U. S.,* 14 Wall. 607 (20 L. Ed. 756) the court, in discussing a similar question, used the following language:

"There is no doubt that under some forms of a charter party the charterer becomes the owner of the vessel chartered for the voyage or service stipulated, and consequently becomes subject to the duties and responsibilities of ownership. Whether in any particular case such result follows must depend upon the terms of the charter party, considered in connection with the nature of the service rendered. The question as to the character

in which the charterer is to be treated is in all cases one of construction. If the charter party let the entire vessel to the charterer, with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated. But, on the other hand, if the charter party let only the use of the vessel, the owner at the same time retaining its command and possession, and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibilities of the owner are not changed. * * All the cases agree that entire command and possession of the vessel, and consequent control over its navigation, must be surrendered to the charterer, before he can be held as special owner for the voyage, or other service mentioned. The retention by the general owner of such command, possession, and control is incompatible with the existence at the same time of such special ownership in the charterer."

See, also, *Ross* v. *Charleston, M. & S. Trans. Co,* 42 S. C. 447 (20 S. E. 285.)

In the case of *Bissel* v. *Torrey,* 65 Barb. (N. Y.) 188, the plaintiff, being the owner of a canal boat, employed the defendants to tow the same from Albany to New York. The boat used by defendants in towing the same did not belong to them, but to a steamboat company, and was chartered by the defendants for the season. It was agreed that defendants were to pay so much for the round trip for the use thereof, and the company were to pay the expenses of running the boat, and were to hire and pay the men engaged thereon, and the defendants were to receive the earnings of the boat after paying expenses. The canal boat, after being towed to New York, was sunk in the harbor through the negligence of the hands managing towboat. It was held that the defendants were not liable to the plaintiff for the consequences of such negligence, and that for the negligence of those employed on the towing boat the owners alone were liable. "It appears to me," says Judge Hough, in

the Santona (C. C.) 152 Fed. 518, "that the best test of the applicability of the rule to any given state of facts is to inquire whose were the agents who wrought the injury out of which the controversy in hand arose." The same inquiry was put by Lord Esher, in 1 Q. B. 258: "When is the captain the owner's captain?"

2. In clause 1 of the contract in question, the words "chartered" and "let" are indicative of a demise, but this formal part of the contract is not controlling. *Grimberg* v. *Columbia Packers' Association,* 47 Or. 257 (83 Pac. 194: 114 Am. St. Rep. 927); *Adams* v. *Homeyer,* 45 Mo. 545 (100 Am. Dec. 391). It was stipulated in this clause that the vessel was to perform such duties in accordance with the terms of the agreement as might be required of her by the charterer. In effect, it was covenanted that the defendant should direct where the vessel was to go, and what she was to do; but it does not appear that the defendant was authorized to direct how the service should be performed, or how the tug should be managed, the details of navigation being left to the owner, who retained command and possession of the vessel through the captain and crew.

Clause 6 provided that all expenses of fuel, supplies, wages of the crew, and other expenses were to be borne by the plaintiffs, who were to keep the vessel fully furnished and in good condition to perform the required duties. They were at perfect liberty to employ thoroughly skilled and competent navigators for the tug at a fair compensation; or, if they saw fit to take such a chance, they might employ less skilled and competent officers and crew, for smaller wages, to nevigate the tug. From the evidence in the case, it also appears that the tug Sampson was under the direct control and management of the captain, who from the terms of the agreement, as well as from the evidence in the case, we think was the agent of the

Sig. 6

owners, and responsible to them, and that the charter party in question did not effect a demise of the tug, but was a mere contract of affreightment. *Grimberg v. Columbia Packers' Association,* 47 Or. 257 (83 Pac. 194: 114 Am. St. Rep. 927) ; *Multnomah County v. Willamette Towing Company,* 49 Or. 204 (89 Pac. 389) ; *The Santona* (C. C.) 152 Fed. 516; *Marcardier* v. *Chesapeake Insurance Company,* 12 U. S. (8 Cranch) 39 (3 L. Ed. 481) ; *Adams* v. *Homeyer,* 45 Mo. 545 (100 Am. Dec. 391) ; *Ross* v. *Charleston M. & S. Trans. Co.,* 42 S. C. 447 (20 S. E. 285).

3. By clause 7 of the agreement, the parties stipulated as to risks or damages to tows, and it is contended on the part of plaintiffs that the defendant Carey thereby agreed to hold the plaintiffs harmless from all risks or damages to tows, cargo, or docks, marine or otherwise. A careful examination of this part of the contract, however, clearly shows that the risks or damages to tows, cargo, or docks assumed by the defendant do not extend to those arising through the negligence of the owners. No attempt was made to stipulate in regard to such damages, even if that could be done. *Wells* v. *Great Northern Ry. Co.,* 114 Pac. 92.

In the case of *The Steamer Syracuse,* 12 Wall. 167 (20 L. Ed. 382), the court said:

"It is unnecessary to consider the evidence relating to the alleged contract of towage, because, if it be true, as the appellant says, that, by special agreement, the canal boat was being towed at her own risk, nevertheless the steamer is liable, if, through the negligence of those in charge of her, the canal boat has suffered loss. Although the policy of the law has not imposed on the towing boat the obligation resting on a common carrier, it does require on the part of the persons engaged in her management the exercise of reasonable care, caution, and maritime skill, and if these are neglected, and disaster occurs, the towing boat must be visited with the consequences."

4. Hence, as to the responsibility for the damages to the schooner Louis, in the harbor of San Francisco and at Knappton, the question is, first, were the injuries caused by the negligence of the plaintiffs? If so, what amount of damage was so caused? And, second, what amount was defendant compelled to pay on account of such damages? In other words, if the plaintiffs, through their agents or otherwise, were not negligent in the management of the Sampson, they are not liable for such injuries. The amount paid by defendant is not the only controlling element. The objection of plaintiffs that they have a good defense to the claim of damages to the Louis is satisfied by the fact that they can make such defense in this action. And if defendant, in making this settlement, paid any more than plaintiffs were liable for, no part of such excess should be allowed him.

The defendant, Carey, appears to have had a contract for the towage of the schooner Louis from Knappton, Washington, to San Francisco, and alleges that she was under his care at the time of the injury, and that he was responsible for her safe towage. Under the agreement with plaintiffs, Carey was interested in preventing the threatened arrest and delay of the Sampson, and the consequent inconvenience of both plaintiffs and defendant, and we think he had the right to pay, in the first instance, any such damage for which plaintiffs might be liable, and to have such payment adjusted in this action. Indeed, we understand that payments are often so made in the maritime business. *The Santona* (C. C.) 152 Fed. 516, and case in note thereto; *Brewster* v. *Warner*, 136 Mass. 57 (49 Am. Rep. 5) ; *White* v. *Bascom,* 28 Vt. 268.

In the last-named case, the hirers of a boat recovered against the owners of a tug, engaged to tow the boat, for damages sustained by loss of the boat and cargo therein. The tug being negligently handled, the tow was lost and the goods destroyed. The plaintiffs owned neither the

boat nor the cargo, but were the hirers of the former, and had the custody of the latter; the goods being owned by a number of persons, who had intrusted them to plaintiffs for carriage and delivery. The plaintiffs had not paid the owners of the goods, and it was held that nevertheless they might recover, even though the general owners might also sue.

See, also, *The Jersey City,* 51 Fed. 527 (2 C. C. A. 365), and *Chicago & Alton Railroad Co.* v. *Kansas City Suburban Belt Railroad Co.,* 78 Mo. App. 245.

5. The question as to who should maintain this claim for damages is one between Carey and the owners of the Louis, as either the bailor or bailee may in such a case maintain an action for redress; and a recovery for damages by either of them would be a full satisfaction and a bar to any subsequent action by the other. The *Mercedes* (D. C.) 108 Fed. 559, citing Story, Bailm. § 94; *The Nonpariel* (D C.) 149 Fed. 521: 525. We therefore conclude that it was error for the trial court to reject the defendant's evidence of this claim.

6. The defendant contends that he was entitled to a deduction of the charter hire ($200 per day) for all the time he did not have the use of the tug, on account of the neglect of the plaintiffs to have said tug staunch, strong, and fitted and provided for the service contemplated by the agreement, or by reason of plaintiffs not supplying a competent crew, or by reason of the improper management of the vessel, or by the want of reasonable diligence on the part of the crew; or, in other words, that plaintiffs should not recover therefor. And he alleges that it was an error for the court to instruct the jury in effect to allow, for such loss, only full days of 24 hours each. The instruction on this point being in part as follows:

"Now, if in the determination of the evidence in this case if you find that the defendant had the use of the Sampson at any time within a period of 24 hours, com-

mencing at 12:30 o'clock a. m., you will make no deductions for any given day covering that period of time."

Defendant requested the court to instruct the jury in substance that, if for any of the reasons mentioned the steam tug Sampson was not at the disposal of defendant "on any day, days, or parts of days," and defendant lost the use of the tug, then defendant was entitled to a deduction of $200 per 24 hours for so much of said time as the tug was not at his disposal. The plaintiffs were responsible for reasonable nautical skill in the management of the Sampson, and there can be no doubt that if plaintiffs failed to perform any of their covenants in the charter party they would be responsible to the defendant in damages, which are alleged, as to a portion of the time lost, to be the amount of the charter hire. The contract does not by its terms contemplate any breach of the covenants on the part of plaintiffs, and the third clause of the charter party does not, in our opinion, provide a rule for computing the time of such loss of service, but only extends to the matter of rebate of $50 per day. It is incumbent upon the plaintiffs to prove the allegation of their complaint, in regard to the time of service of the tug, in so far as the same is denied. We think that the substance of the instruction upon this point asked by defendant should have been given.

Under clause 3 of the charter party, defendant claims to be entitled to a rebate of $50 per day for any full period of 24 hours, when he had no active use for the tug. By this clause of the agreement, the parties stipulated as to when a rebate should be allowed, which they had a perfect right to do, and how the idle time should be determined, making the log of the tug the arbiter, as it were, in the matter. And we think when the log of the tug showed the vessel had not been in use, during any 24 consecutive hours, on account of defendant having no active use for

her, then he should be entitled to a rebate of $50. The question is not what the rebate ought to be, but what the contract was.

7. The allegation of plaintiffs as to the condition of the tug was denied by defendant. The court properly instructed the jury in this regard as follows:

"I instruct you that the burden of proving that the Sampson was tight, staunch, and strong, and in every way fitted and provided for use as a vessel engaged in the business of towing lumber at the time this agreement was made, is upon the plaintiffs."

Note the case of *The Edwin I. Morrison,* 153 U. S. 199 (14 Sup. Ct. 823 : 38 L. Ed. 688), in which the libel set up the damaged condition of the goods, and that the vessel upon leaving port "was not tight, staunch, strong, and every way fitted for said voyage as agreed." The answer alleged that the vessel encountered rough and tempestuous weather, and was damaged by the perils of the seas, which are excepted in contracts of affreightment. In the opinion, Mr. Chief Justice FULLER used the following language:

"Perils of the sea were excepted by the charter party, but the burden of proof was on the respondents to show that the vessel was in good condition, and suitable for the voyage, at is inception, and the exception did not exonerate them from liability for loss or damage from one of those perils to which their negligence, or that of their servants, contributed."

It is assigned as error that the other instructions given by the court are in conflict with the above instruction, but we do not deem that it would be of any aid, upon a retrial of the case, to note the instructions at length, or to consider all of the assignments of error.

Upon the trial, the cross-examination by defendant's counsel of the witnesses for plaintiffs, Hobson and Jones, was, by the court in regulating the order of proof, kept within narrow limits, with the express permission for

defendant to recall the witnesses for further examination, which, if allowed under the application of a liberal rule, would serve defendant's purpose and protect his rights in the premises.

The judgment of the lower court is reversed, and the cause remanded for a new trial.          REVERSED.

---

On Motion to Dismiss, decided November 1, 1910.