**BRITISH MARITIME TRUST, Limited, v. MUNSON S. S. LINE.**

(District Court, S. D. New York. November 14, 1906.)

1. SHIPPING—MANNER OF LOADING BY CHARTERER—USE OF MASTS TO SUPPORT BOOMS.

A custom of charterers of vessels to use their masts as parts of the apparatus of derricks for loading and discharging cargo, in the absence of express contract, cannot impose on the owners of chartered vessels the duty and responsibility of providing masts of sufficient strength to sustain loads of unusual and excessive weight, and, where a vessel is of such strength in construction as to fully meet all the requirements of her class and rating at Lloyds, and of her charter, and a charterer, who, without the consent of the owner or master, in loading subjects her masts to strains far above their computed working strength, takes the risk and responsibility.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 219, 220.]

2. SAME—LIABILITY FOR BREAKING OF MAST.

A steamer was chartered by a time charter to be employed in carrying lawful merchandise. The loading was to be done by the charterer with the assistance of the crew; the owners to provide ropes, falls, etc., to handle ordinary cargo up to three long tons in weight, and the captain to be under the orders of the charterer as regards employment, agency, or other arrangements. At the time of the charter the nature of the cargo was unknown, but the charterer subsequently decided to take a full cargo of 35 locomotives from New York to Colon. The boilers weighed 18 tons, of 2.000 pounds each, and the tenders 14 tons each. The vessel's tackle being inadequate to handle such weights, the charterer, without consulting the master, rigged a boom connected to the mast, which was strengthened by preventers, which, however, and especially on one side, were inadequate to secure rigidity of the mast. When most of the cargo had been loaded, and while a tender was being lifted, first a shroud pin and then the mast broke. Both were of sufficient strength for ordinary purposes, and the vessel was rated by Lloyds as 100 A1. *Held*, that the responsibility for the loss rested upon the charterer, and not upon the vessel.

3. SAME—DUTY TO PROVIDE MEN TO RUN WINCHES.

Under a charter party which required the owners "to provide men to run winches," the ship's duty is satisfied by furnishing competent men. although they may not be personæ gratæ to the charterer's stevedores."

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. § 161.]

In Admiralty. On libel and cross-libel.

Convers & Kirlin and Mr. Hickox, for libelant and cross-respondent.

Wheeler, Cortis & Haight and Mr. Bullowa, for respondent and cross-libelant.

HOUGH, District Judge. While loading cargo in this harbor on April 25, 1906, the mast of the steamship Austriana, then under charter to the Munson Steamship Line, buckled and broke. The owners of the vessel have been obliged to pay for the cost of repairs, and the charterers have incurred expense through delay and interfer-

ence with the loading and discharge of the cargo. Each party alleges that the breaking of the mast was the fault of the other, and both have filed libels.

The vessel had been chartered on April 6th, and before that date no information had been given the owners as to the cargo intended for her, and, indeed, the charterers did not know until after that time with what they would load her. The charter party is in the "Government form" of time charter, has been known to the trade for many years, and contains no direct reference to the steamer's masts. The charter provisions material, in the opinion of either party, to this controversy, are, in substance, as follows: The steamship is described as of 6,800 tons dead weight carrying capacity, built in 1901, and classed 100 A1 at British Lloyds. She is stated as "tight, staunch, strong and in every way fitted for the service." She is to be "employed in carrying lawful merchandise." The owner is to provide and maintain a full complement of officers, seamen, engineers and firemen. The charterers shall pay "all other charges whatsoever," except those specifically allotted to owners' account by the charter party. The captain "shall render all customary assistance with ship's crew and boats." The captain shall be appointed by the owners, but shall be "under the orders and direction of the charterers as regards employment, agency or other arrangements." The owners are "to provide ropes, falls, slings and blocks, necessary to handle ordinary cargo up to three tons (of 2,240 lbs. each) in weight." The steamer is "to work night and day, if required by charterers, and all steam winches to be at charterers' disposal during loading and discharging, and steamer to provide men to work same both day and night as required; charterers agreeing to pay extra expense, if any, incurred by reason of night work, at the current local rate." In the event "of loss of time from deficiency of men," payment of charter hire shall cease until the vessel be "again in an efficient state to resume her service."

On or about April 9th, the charterers concluded to use the Austriana to carry a cargo of locomotives from New York to Colon. They hoped to ship on her 40 complete engines, but she was found capable of stowing no more than 35. The loading of each locomotive entailed the lifting of a boiler and tender, besides other smaller parcels. The packed weight of a boiler was known to be from 18 to 19 (short) tons, and of a tender something over 14 (short) tons. Thus 70 packages, weighing over 14 tons, were in some way to be lifted on board in New York, and similarly gotten overside at Colon.

The charterers are, and for years have been, large employers on time charter of vessels in West Indian and South American trade. Their fleet seems to average about 50 vessels, and it has at times been even more numerous. It is, and long has been, their habit, and that of other charterers, to use the masts of vessels in their employment as parts of the apparatus of derrick booms, etc., necessary for the handling of cargo. They had in their business used masts in loading packages weighing as much as 20 or (according to some witnesses) 25 tons; but never before had they destined for any one vessel a cargo containing such numerous heavy weights as those they elected to put on board the Austriana.

The master of the steamship testifies that, when he learned the nature of his cargo, he told the charterers' agents that he could form no judgment as to the sufficiency of his masts for handling such heavy lifts, and that to him the masts seemed too slight for the purpose. While this testimony seems to me inherently probable, it is most positively denied by the representatives of the charterers, and I find, on the testimony of the more numerous witnesses produced by the charterers, that the Munson Line did not communicate with the master, did not ask his opinion, did not seek his judgment as to the strength of his masts, and made no examination of the masts whatever, limiting their inspection of the steamship to the capacity of her holds and their suitability for the stowage of this unusual cargo.

The charterers' "outside superintendent" personally rigged the Austriana to load her cargo, and describes himself as "the responsible party." It is evident that the work was looked upon as unusually arduous and as requiring special care, for, beside the superintendent, two foremen stevedores regularly employed by the charterers seen to have been on board most, if not all, of the time. The mainmast of the Austriana was 20½ inches in diameter at a point 9 feet above deck and just above the "pad" which surrounds the mast and supports the derrick booms belonging to the ship. The shrouds met on either side of the cross-trees, and were there supported on a two-inch iron bolt running through holes in the cross-trees. The three shrouds on each side were thus supported by one pin. This arrangement is rather a new fashion, but during the last seven or more years has become quite common. It is obviously easier and cheaper to build than the old fashioned mast-ring or the separate pad and eye for each shroud. It is also probably less strong, as it measures the holding strength of all the shrouds on one side by the strength of a single pin. As the ship was not required to furnish tackle for more than a three-ton lift, the charterers put on board a boom confessedly stronger than the mast, stepped it on an oaken shoe fastened to the deck by angle bars riveted through the deck plates (boring holes for the purpose through the plating), and connected it to the mast by a topping lift of several parts of steel hawser.

Concededly, before subjecting the mast to the expected strain, it needed strengthening by preventers. The charterers, accordingly, rigged on the port side, a preventer almost wholly of steel wire rope, leading straight from masthead to deck; and on the starboard side they constructed an arrangement of manila rope (in effect) leading from the masthead to the end of a smaller derrick boom standing up at an angle and attached to the side of the mast away from the loading hatch, and from the end of that boom leading to a point on the deck opposite the lower end of the wire preventer. I find that these preventers did not, and could not, take up or resist equal strains, because they were necessarily of unequal tensile strength, i. e., the manila would stretch far more than the wire, with the result that the starboard shrouds were continually subjected to more than their fair share of strain.

I further find that the starboard preventer was defective, in that it had not a "straight lead." The object of a preventer is to secure rigid-

ity, and to do this it must itself be as rigid as possible, and this arrangement of ropes and boom could not be rigid for obvious mechanical reasons. I agree with the witnesses who have described this starboard preventer as a "makeshift." The reason for its existence is, in my opinion, that the cargo was coming in over the starboard side, and the stevedores did not wish so permanent a thing as a wire rope securely fastened to interfere with their operations. The derrick boom and appurtenances used for the makeshift preventer could be, and had been shortly before the accident, themselves used for smaller parcels of cargo.

These arrangements of the charterers were neither devised, assisted in, nor objected to by the master or officers of the steamer. The mate pointed out the starboard shroud pin as a place to fasten one of the blocks comprised in the starboard preventer, and sometimes suggested tautening or loosening this or that rope; but the management of the whole matter was, in my opinion, with the charterers, and their superintendent has testified to his own responsibility therefor. After nearly all the cargo was aboard, after most, if not all of the 18-ton boilers had been lifted, and while a 14-ton tender was hanging suspended amidships from the charterers' boom, the starboard shroud pin broke, instantly slackening the starboard rigging, the mast broke in the pad, and the weight fell, fortunately only six inches and without causing further damage.

Much testimony has been taken to prove that the mast was weak. Its construction might have been improved, and it broke at its weakest point; but it is clear that no mast would have stood after the shroud pin broke. I find the mast good, if properly stayed.

The pin also is declared weak, and it seems of a hard and somewhat brittle fiber, though externally perfect. In my opinion it too would have lasted through the remaining 10 per cent. of cargo, had the starboard stay been as good as the port one.

The foregoing facts appear to me to furnish ample justification for putting the responsibility for this accident upon the charterers. They made no inspection, they asked no advice, they assumed a mast sufficient for the heaviest cargo they had ever handled, they rigged an unscientific and necessarily insufficient preventer, and the disaster happened as the load was just at the point where the greatest strain was upon the defective starboard apparatus. The importance, however, of ascertaining, if possible, such limitations as may exist upon the right of a charterer to use the chartered vessel's masts, leads me to consider carefully the arguments based upon the asserted legal duties or privileges of the parties, rather than upon the confessedly singular circumstances of the Austriana's remarkable cargo.

The charterers assert, admitting arguendo the facts as hereinabove found:

1. That the silence of the Austriana's captain, or his failure to object to the loading arrangements devised by the charterers, rendered such arrangements those of the ship, and made their failure something for which the shipowners are responsible to the charterers. No authority is produced for this proposition. The master was by the agreement of charter "under the orders and direction" of the charterers, and he

was also bound to "render all customary assistance with the ship's crew." To assert that, because he might have been ordered to set up these loading arrangements, and to use his crew so to do, therefore (although nothing of the sort was done) his owners became responsible for the negligence of those who actually did the work, is, I think a unique method of escaping liability for one's own acts. The contention is overruled, without expressing any opinion as to what would have been the effect, either inter partes or in respect of third persons, had the master actually done what the charterers did.

2. The charterers' main contention, however, was asserted by them in letters to the shipowners' agents even before this accident. Out of that asserted right, irrespective of any details of negligent or insufficient rigging, this litigation has really grown.

The Austriana's master, even before the fracture of the mast had demonstrated danger, objected to being required to unload at Colon, with himself as chief stevedore, this extraordinary cargo. The charterers immediately asserted their right to load the ship "with any lawful merchandise." They declined to accept "responsibility for any accident occurring directly or indirectly through the discharge of this heavy cargo," and their counsel now insist that, inasmuch as locomotives are lawful cargo, they had a right to use the ship's masts for the loading and unloading thereof, and any deficiency in strength on the part of the masts or rigging is as much an infringement of their rights as a lack of seaworthiness in the hull of the steamship. This statement of the charterers' claim avoids, however, discussion of the vital question to be considered in limine. It assumes that 35 locomotive boilers, weighing 18 tons each, and an equal number of tenders, weighing 14 tons each, were, so far as the use of the Austriana's mast was concerned, lawful cargo. It would hardly be contended that an article of such high specific gravity as to permit 100 tons thereof to be laden on a small fraction of the deck space of a hold, having 100 tons capacity, could be lawfully so loaded as to crush the deck, though that deck were perfectly capable of sustaining the same weight when properly distributed. So, too, the bare fact that locomotives are lawful cargo does not prove that charterers had any right to so load them as in the loading to destroy the ship's mast.

In legal effect I think the charterers' contention must rest upon either (a) an implied warranty of the mast as capable of use in loading a cargo such as this one, or (b) upon a custom of using the masts of chartered vessels for the loading and discharge of single packages of cargo weighing as much as 25 tons, in the light of which custom the charter must be construed. I think the two statements are substantially identical. If the alleged custom be sustained, it imports into the charter a warranty that the masts shall be sufficient to meet the requirements of the established custom.

It is therefore necessary to ascertain the shipowners' measure of duty in respect of his ship's loading capacity under such a charter as this. The Austriana was not only 100 A1, but was built under special inspection. Her masts, rigging, and cargo appliances correspond to each other. They are properly built and well fitted for lifting packages of from three to five tons, and such masts, etc., are usual and sufficient for her

class and rating at Lloyds. It results that for handling of weights even up to five tons, the limit placed by the evidence, she was in the language of the charter party "strong." The charterers do not deny this; indeed, they assert that her mast was of the usual size, and her rigging, except for the new fashioned shroud pin, usual and sufficient. Nor do they deny that her apparatus generally is within the express language of the charter party; but they assert that, when they get a mast of that size with rigging to suit, then that particular mast and rigging must be capable of the loads they insist upon as their right, and some of their witnesses even demand the same to be sufficient without preventers.

The charterers have not offered to show that either owners generally, or the Austriana's owners in particular, are aware of or have assented to the alleged custom, and they make no denial of the right of Lloyds' inspectors to regulate the equipment of vessels known and described by their ratings. It appears that the 14-ton load which broke the pin and mast produced, owing to the length of the charterers' boom, a total moment or strain variously calculated at from 155 to 216 tons, which had to be supported or resisted to varying extents by mast, derrick boom, shrouds, and preventers; and the most careful calculation of the probable strain on the shroud pin at the time of fracture is 18.3 tons. But the lifting apparatus of a ship, like other machinery and appliances subjected to varying stresses, is calculated for a "working strain" only, while the "breaking strain" of the same appliance is ordinarily five times as great. This has been testified to in this case and is the statement found in engineering text-books of authority.

In Carlson v. Comeric Co. (D. C.) 140 Fed., at 111, the court found that the "permissible actual strain on a hook requires a draft to be only one-sixth of the load that in theory would require the breaking point to be reached." The working strain for which the Austriana's mast and rigging were designed had been far exceeded for days before this accident, and the charterers' practice amounts to a demand that the owners of the Austriana either warrant their masts, etc., to be sufficient for regular work nearly up to the breaking strain, or be bound by a custom, not known to them, that a charterer may habitually so work them. No such warranty can be found in, or imported into, this charter party, and from the alleged custom the first essential is lacking, viz., reasonableness; and, if it is not reasonable, it is not lawful. What these charterers have habitually done is, as to vessels of the Austriana's class, both dangerous and unjustifiable. If the charter party affords any implication, it limits the warranty of the mast to three tons, and nothing in the evidence extends that weight beyond five tons of working strain. If, as alleged, the business of time chartering for outports depends upon using masts for heavy lifts, either the charterers must take the risk, or they must revise their charter party.

It is asserted that these charterers are entitled to a decree, under the authority of Worrall v. Davis Coal & Coke Co. (D. C.) 113 Fed. 549, on appeal 122 Fed. 436, 58 C. C. A. 418. The higher court there found that it was customary to protect a ship's coamings by planks and dunnage while a charterer's cargo of ore was coming on board by chutes. This custom the master failed to observe, although he had the means of

complying with it, and previous knowledge of the danger to which his ship would be subjected while loading cargo of such a kind. In this case the arrangements for loading cargo were wholly those of the charterer, they assumed to do everything needful, and I fail to see that the master could have done anything to improve the situation when the charterers' representatives, men more experienced than he, were actively making the deliberate mistakes above described.

I have considered the remarks of the court in the unreported case of The Mae.[1] It may be assumed that, under the peculiar circumstances of that case, the Mae's captain, though acting as the agent of the charterer in unloading his ship, was acting as the agent of his owner in preserving his ship from injury while so unloading; but it does not follow that the unconsulted master of the Austriana was chargeable with the duty of preventing the charterers' own arrangements from injuring his ship, at the peril of rendering his owners responsible to those charterers for the consequences of their own acts.

By amendment to the original libel, the owners assert that the injury to their deck plating, caused by the construction of the derrick shoe, above described, has not been properly repaired, because new deck plates have not been provided or paid for. This shoe was placed on the vessel without consultation with her master, but after the charterers had agreed in writing that "any alterations whatsoever made with the consent of the master in the fittings or structure of the said steamship," shall "be made good * * * at the expense of the charterers and to the entire satisfaction of the master." On the redelivery of the vessel the repairs to her deck plating, made by charterers, were regarded as sufficient by Lloyds' surveyor to make the vessel "perfectly fit and seaworthy" and to entitle her "to hold her classification." I think the demand for an entirely new plate is captious, and that the alteration in the structure of the steamship caused by these holes has been "made good."

The foregoing considerations require the dismissal of the charterers' libel, with the possible exception of some portion of their claim for the cost of shore winchmen. It seems that, while loading in New York, the charterers employed men to run the winches who belonged to the same labor union as did the working stevedores, and it is now claimed that, inasmuch as the charter party required the owners "to provide men" to work the winches both day and night, they are thereby required to provide union men, irrespective of the competency of the ship's crew, who for generations have been used in this work. The charterers' libel makes no such claim. It only alleges that the New York stevedores would not work on the steamship with sailors running the winches "owing to the risk of personal injury"; that the sailors "were without experience in handling heavy cargo, and were unfit to act as winchmen for the loading or discharging of this particular cargo, and it was therefore necessary to employ skilled winchmen." The only testimony offered is, in substance, that, although the union rule does not require union winchmen, in practice the New York stevedores will not work with sailors at the winches as long as they can get their own men

[1] Oral memorandum.

to do the work; but, when their own men are all busy, "they won't shut a ship off." This is not sufficient to sustain the libel.

On the question of union winchmen, I am referred to the commissioner's report in the case of The Cape Corrientes (Golcar S. S. Co. v. Tweedie Trading Co., 146 Fed. 563). It there seems to be held that the owners' obligation "to provide men to run winches" implies an obligation not only to provide competent men, but to provide personæ gratæ to the charterer's stevedores. To this proposition I do not assent, but the pleadings herein do not require further consideration thereof.

There is, however, some testimony to the effect that at Colon the seamen did not and could not run winches, because they were drunk and in jail. If the charterers suffered any damage by this time-honored maritime indiscretion, they are entitled to recover for it, but the amount is not sufficient to require the retention of the charterers' libel, especially in view of the variance between libel and proof.

Upon the owners' libel, let there be a decree for the libelant with the usual order of reference, but with authority to the respondent to prove as a set-off such damages as were occasioned by the drunkenness, or incompetency as winchmen, of the crew at Colon. The charterers' cross-libel is dismissed. Costs of both cases to the owners.