## THE SANTONA.

### CLYDE COMMERCIAL STEAMSHIPS, Limited, v. UNITED STATES SHIPPING CO.

(District Court, S. D. New York. April 9, 1907.)

1. SHIPPING—TIME CHARTER—LIABILITY FOR CARGO SHORTAGE.

The "government form" of time charter party constitutes a hiring of the capacity of the vessel for carrying cargo and earning freight moneys and for the use of the vessel, master, and crew for the advancement of the charterers' gain. The ship remains the owner's ship, and the master and crew his servants for all details of navigation and care of the vessel, but for all matters relating to the receipt and delivery of cargo, and to those

earnings of the vessel which flow into the pockets of the charterers, the crew are the servants of the charterers, and claims paid by the charterers for short delivery of cargo, arising from an error of the mate or some other member of the crew in tallying cargo, cannot be deducted from the hire.

2. SAME—CONSTRUCTION OF CHARTER—PAY OF WINCHMEN.

Under a provision of a time charter requiring the owners to provide men to work the winches both day and night as required, the ship's duty is fulfilled by providing sober and competent winchmen from among the crew, and, where the charterers for their own convenience employ shore winchmen, the wages of such winchmen cannot be deducted from the charter hire.

3. SAME—DEDUCTION FROM HIRE—TIME IN QUARANTINE.

Where a time charter party provided that the hire was to be paid after the vessel was placed at the charterers' disposal, and to continue until her redelivery, and provision was made under the usual breakdown clause that hire should be suspended in certain instances, among which time lost in quarantine was not included, a further provision that restraint of princes, peoples, etc., "shall excuse compliance with this charter," does not authorize a deduction from the charter hire while the vessel lay in quarantine for a period of 36 hours, where the detention was not shown to have been due to any violation by the owner of other provisions of the charter.

4. SAME.

Where it is specifically agreed by charter party that hire shall be suspended in certain instances, it cannot be suspended by implication for reasons not assigned in the contract.

In Admiralty. Suit to recover charter hire.

Convers & Kirlin, for libelant.

Wing, Putnam & Burlingham, for respondent.

HOUGH, District Judge. The libelants, having chartered their steamship Santona to the respondents for the term of four months, bring this libel for charter hire, and respondents seek to set off against the amount admittedly due certain items of alleged damage hereafter specifically to be considered. The time charter by which the rights of the parties must be measured contains (with differences material to but one of the set-offs advanced) all the clauses printed at length in Golcar S. S. Co. v. Tweedie Trading Co. (D. C.) 146 Fed. 564. The document is, indeed, the widely known "Government Form" of time charter, and declares in limine that the "owners agree to let and the said charterers agree to hire" the steamship for the agreed term, from the time of her "delivery" to the charterers. The charter here presented also substantially contains the clauses recited in the Endsleigh (D. C.) 124 Fed. 858.

1. The respondent issued bills of lading for certain cargo, which cargo turned out short at the port of delivery. Such bills of lading were issued "in pursuance of the provisions" of the charter party in suit, and were based, as to the quantity recited therein, upon the mate's tallies. Having paid the consignees' claims for shortage, respondent seeks to set off the amount thereof against the charter hire. It will be assumed arguendo that the tallies were incorrect, and the error that of the mate or some other member of the crew.

The case of the Golcar S. S. Co., supra, is decisively in favor of the shipowner on the question of shortage. In the result of that decision

I concur, but am unable to accept all of the conclusions of law there stated. The rule of law separating the letting of a ship from a contract for her services has been too often stated to admit of doubt. I perceive no difference in meaning between the language of Lord Esher, declaring that the letting or demise of a ship is a parting with the whole possession and control thereof, and the somewhat fuller phrase of Justice Clifford, stating the test to be whether the charterer assumes the exclusive possession, command, and navigation of the vessel. Baumvoll v. Furness, 1 Q. B. (1892) 258, A. C. (1893) 8; Reed v. United States, 11 Wall. 591, 20 L. Ed. 220; U. S. v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403—concurred in by Auten v. Bennett, 183 N. Y. 496, 76 N. E. 609. Cf. The Del Norte (D. C.) 111 Fed. 542; The City of Everett (D. C.) 107 Fed. 964, reversed on another point, 115 Fed. 669, 53 C. C. A. 301; Bramble v. Culmer, 78 Fed. 497, 24 C. C. A. 182.

Nor is there any difficulty in formulating the consequences flowing from a letting of the ship, as distinguished from a contract for her services. In the former case, the relation between owner and charterer becomes that of bailor and bailee; whereas, in the latter, the relation is that of shipper and carrier. Carver (4th Ed.) § 112; The Barnstable, 181 U. S. 469, 21 Sup. Ct. 684, 45 L. Ed. 954. The difficulty lies, not in the statement of the rule or the recognition of the consequences thereof, but in its application to the infinitely varying circumstances of contract between shipowners and charterers. It appears to me that the best test of the applicability of the rule to any given state of facts is to inquire whose were the agents who wrought the injury out of which the controversy in hand arose. It is the same inquiry put by Lord Esher, in 1 Q. B. 258: "When is the captain the owner's captain?" That question, as applied to this case, is: Was the mate, when tallying cargo, the owner's mate? And the answer to that question must be ascertained by considering the provisions of the charter party affecting the receipt, carriage, and delivery of cargo as between owner and charterer.

Under the very ordinary form of time charter involved in this cause, it shocks knowledge common to all men acquainted with maritime business to say that the owner has surrendered the possession or control or command or navigation of his ship. But he has surrendered control of her freight and passenger capacity and handed the same over to the charterers for all lawful purposes. The ship is the owner's ship, and the master and crew his servants for all details of navigation and care of the vessel; but for all matters relating to the receipt and delivery of cargo, and to those earnings of the vessel which flow into the pockets of the charterers, the master and crew are the servants of the charterers. There is, in fact (to borrow a simile from another branch of the law), an estate carved out of the ship and handed over for a specified term to the charterer, and that estate consists of the capacity of the vessel for carrying freight and earning freight moneys, and the use of the vessel, master, and crew, for the advancement of the charterers' gains. It follows that, when the mate was tallying cargo, he was the charterer's mate, and the set-offs for shortage claimed by the respondent are disallowed.

2. It appears that, while the Santona was at Colon, the winches were operated by shore employés furnished and paid by the charterer. By the charter party, the owners agreed "to provide men to work" the winches "both day and night as required." See section 24 of Charter Party, quoted in Golcar S. S. Co. v. Tweedie Trading Co. (D. C.) 146 Fed. 565. The crew were competent for this purpose, and the master was ready to furnish the necessary winchmen. The stevedores of Colon were negroes, and it was preferred by the charterer, and acquiesced in by the captain, not to put the seamen at the winches and under the orders of foremen stevedores of a different color. I think the ship fulfilled her entire duty in providing sober and competent winchmen from among the crew, and I see no reason to depart from the opinion expressed in British Maritime Trust v. Munson Line (D. C.) 149 Fed. 533. The claim for winchmen's wages is disallowed.

3. The Santona left Colon for Daiquiri, and thence sailed to Baltimore. On arrival at that port, two cases of fever were found on board. The vessel was quarantined 36 hours, and the fever diagnosed as malarial. She was then discharged. On this point, the Santona charter party differs from that set forth in the case of the Golcar S. S. Co., supra. It is provided by clause 17 that "restraint of princes, people," etc., "shall excuse a compliance with this charter." And it is further provided:

"That whilst the steamer is in Central American ports the crew shall not be allowed on shore, and the steamer shall be liable for any delay and expense of quarantine and all other detention which may arise from a violation of this clause."

While the Santona was at Colon, the master posted notices forbidding the seamen to go on shore, and seems to have taken no other or more effective measures to prevent such action on their part. I do not think that this was a compliance with the charter requirements; but there is no evidence showing, or tending to show, that the quarantine detention at Baltimore was caused by this omission of the captain. It was held, in The Progreso, 50 Fed. 835, 2 C. C. A. 45, that enforced obedience to lawful quarantine regulations is a restraint proceeding from the people. And it must follow from that decision that during the 36 hours of lawful detention at Baltimore "compliance" with the Santona's charter party was "excused." But I do not think that it follows that the clause regarding restraints of peoples suspends the payment of charter hire during the ordinary course of a voyage undertaken for the charterer's gain, when some period of quarantine was ordinarily to be expected. It is specifically provided that the hire is to be paid after the vessel is "placed at charterer's disposal," and "to continue until her" redelivery. Deductions of hire are specifically provided for in the usual breakdown clause, and by the specific quarantine clause above quoted. It was held by a former judge of this court, sitting as arbitrator in The Steamship Hackney,[1] that, where it is specifically agreed by charter party that hire shall be suspended in certain instances, it cannot be suspended by

[1] See note at end of case.

implication, for reasons not assigned in the contract, and in that ruling I entirely concur. The set-off asked for under this head is exactly the charter rate for the period of 36 hours. No damages to the charterer are shown by the detention, and no connection between the detention and clause 21 of the charter party. As a claim for hire deduction, it is disallowed. Tweedie Trading Co. v. Emery Co. (D. C.) 143 Fed. 144, as affirmed in the Court of Appeals on March 26, 1907 (154 Fed. ——), cannot be used as authority for respondent's interpretation of the "restraint" clause of the charter party. The decision of the higher court was put entirely on the breakdown clause.

Decree for libelant, with interest and costs.

NOTE.—Following is the opinion of Ex-United States Judge Wm. G. Choate, as arbitrator, referred to by Judge Hough:

The matter in controversy arises on a time charter of the British steamship Hackney, entered into in New York in April, 1901. The charter was for six calendar months at the rate of £1,350 per month. The charterer has deducted the hire of the vessel for 21 days, and by agreement the amount has been deposited in a bank at Hamburg, subject to the decision in this matter. The charter recites that the vessel is tight, staunch, strong, and every way fitted for the service (and with full complement of officers, seamen, engineers, and firemen for a vessel of her tonnage), and provides that she is to be so maintained during the continuance of the charter party to be employed in such lawful trades between specified ports as charterers or their agents shall direct, on the following conditions:

"(1) That the owners shall provide and pay for all the provisions and wages and consular shipping and discharging fees of the captain, officers, engineers, firemen and crews, shall pay for the insurance of the vessel, for all engine room stores and deck stores and maintain her in a thoroughly efficient state in hull and machinery for the service.

"(2) That the charterers shall provide and pay for all the coals, fuel, port charges, pilotages, agencies, commissions and all other charges whatsoever, except those before stated, and shall accept and pay for all coal in the steamer's bunkers on delivery, and the owners shall on expiration of this charter party pay for all coal left in the bunkers, each at the current market price at the respective ports, when she is delivered to them.

"(3) That the charterers shall pay for the use and hire of said vessel at the rate of £1,350, say—thirteen hundred and fifty pounds—Br. Stg. per calendar month, commencing on the day of delivery and at and after the same rates for any part of a month; hire to continue from the time specified for terminating the charter until her delivery to owners (unless lost) at a safe port, etc.

*    *    *    *    *    *    *    *    *    *

"(6) That the whole reach, burthen and passenger accommodation of the ship (not being more than she can reasonably stow and carry) shall be at the charterer's disposal; reserving only proper and sufficient space for ships, officers, crew, tackle, apparel, furniture, provisions and stores.

"(7) The captain shall prosecute his voyages with the utmost dispatch and shall render all customary assistance with ship's crew, tackle and boats.

"(8) That the captain (although appointed by the owners) shall be under the orders and direction of the charterers as regards employment, agency or other arrangement, and the charterers hereby agree to indemnify the owners from all consequences or liabilities that may arise from the captain signing bills of lading, or in otherwise complying with the same.

"(9) That if the charterers shall have reason to be dissatisfied with the conduct of the captain, officers or engineers, the owner shall on receiving particulars of the complaint investigate the same, and if necessary make a change in the appointments.

*    *    *    *    *    *    *    *    *    *

"(12) That in the event of loss of time from deficiency of men or stores, break-down of machinery, stranding, or damage preventing the working of the vessel for more than twenty-four running hours, the payment of the hire shall cease until she be again in an efficient state to resume her service; and should she in consequence put into any other port other than that to which she is bound, the port charges and pilotages at such port shall be borne by the steamer's owners; but should the vessel be driven into port or to anchorage by stress of weather, or from any accident to the cargo, such detention or loss of time shall be at the charterer's risk and expense.

"(13) That should vessel be lost any hire paid in advance and not earned (reckoning from the date of her loss) shall be returned to the charterers, with interest from date of loss. The act of God, the queen's enemies, fire, restraint of princes, rulers and people, and all and other dangers and accidents of the seas, rivers, machinery, boilers and steam navigation, throughout the charter party always excepted."

  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

On November 20th, the vessel sailed from New Orleans with a cargo of phosphate, cotton, cotton seed oil, and staves for Rotterdam and Nantes, via Norfolk. On November 28th she arrived at Norfolk and took on coal. On November 30th she passed out to sea. On December 3d, at 5:30 a. m., fire was discovered in No. 2 hold, in which was stowed cotton. Attempt was made to put out the fire by injecting steam into No. 2 hold through a hole cut for that purpose in the bulkhead separating that hold from the stokehold, and steam was so injected for 49 or 50 hours. On the morning of December 5th, the fire not being extinguished, the vessel's course was changed for Halifax, then about 300 miles distant. The captain's purpose was to proceed towards Halifax, and, if he succeeding in putting out the fire before reaching that port, to resume his voyage, otherwise to put into that port for help. When she got near Halifax, the fire was not subdued, and she went into that port, arriving on December 5th about 4 in the afternoon. At Halifax, by the aid of outside fire apparatus and the vessel's own steam, attempts were made unsuccessfully to subdue the fire, till finally it was extinguished by flooding No. 2 hold with water. The cotton and the oil were removed, and part of it remained at Halifax to be forwarded. Some bales of cotton were destroyed, and many were injured by fire and water. The effect of the fire on the vessel was that the bulkheads were buckled by the heat, and there was loss of tarpaulins, cordage, and some other articles, and by the strain to which the boilers were put in the efforts to put out the fire many of the boiler tubes leaked. Slight repairs were made to the engines and boilers at Halifax, while work was going on in discharging and reloading the cargo, and on December 19th the ship was ready to proceed on her voyage.

While the vessel was at Halifax, some of the ship's coals stowed in the between decks over No. 2 hold got on fire, as did also a wooden bulkhead behind which the coal was stowed. This fire was easily extinguished and the coal removed to the ship's bunkers. A difficulty arose, however, when the ship was ready for sea, as to the disbursing of the ship at Halifax. The charterer took the ground that it was the duty of the owners to supply funds for this purpose. The owners refused to do so, and claimed that under the charter party it was for the charterer to supply the funds. Neither party would give way, and, on the 25th of December the vessel, cargo, and freight were libeled in the Admiralty Court for necessaries furnished the ship by parties in Halifax who had paid the expenses there and who were also the general agents of the charterer. The ship, being arrested, was released on bond given by or on behalf of the owners, and she then proceeded. In the following April the Admiralty Court gave a decree for the libelants, which was satisfied by the owners. The loss being clearly a general average loss, an adjustment took place after the arrival of the ship at Rotterdam. In accordance with the York-Antwerp rules, the wages and provisions during the stay at Halifax were allowed to the owners in the general average adjustment.

The principal question is whether the claim of the charterer that the hire of the vessel ceased during this deviation from the voyage, in going into and staying at the port of Halifax for the purpose of putting out the fire, should be allowed.

It is claimed on behalf of the charterer that the case comes within the twelfth condition of the charter party, as a loss of time from damage preventing the working of the vessel for more than 24 hours. I think, however, it is clear that that clause could come into operation only in the event of damage to the ship. It is very true, as pointed out by the learned counsel for the charterer, that it was necessary to put into a port of refuge for the safety of the ship, as well as the cargo, and that, if she had proceeded on her voyage, it is extremely probable, and may be assumed as a fact, that both ship and cargo would have been totally destroyed by fire at sea. Yet it clearly appears by the testimony that the ship was not so damaged by or in consequence of the fire that she was not at all times well fitted to continue the voyage. The slight repairs made at Halifax could safely have been postponed till she reached Rotterdam. The trifling nature of the repairs to the boilers is shown by the fact that they cost only $36. Nor is it shown that these repairs, if necessarily made there, would have required more than 24 hours nor that the ship was delayed at all thereby. The parties having in the charter party specified in what cases of disaster allowance shall be made of time lost to the charterer, the case must be fairly brought within that specification, which cannot be enlarged by implication or on a theory that a case not so specified is within its reason. Moreover, this was clearly a case of accident to the cargo, loss of time from which is by the same clause of the charter party at the risk of the charterer.

While it is possible, of course, that if the attention of the parties had been called to a case like this of threatened damage to the ship by fire in the cargo, making necessary the bearing off to a port of refuge, they might have expressly provided for it by throwing the loss on the ship or by dividing it between ship and cargo; yet, they have not done so, and they must both stand on the contract they have made, which makes damage to the ship causing delay a requisite for this time allowance. And in this respect the case differs entirely from that of The Yesso, decided by Mr. Wm. Allen Butler as arbitrator. There the fire not only attacked the cargo, but actually extended to the ship, as he expressly finds, so as to disable her from prosecuting her voyage. The decision of the Admiralty Court at Halifax has no bearing on this question. The learned judge simply held that the libelants had supplied necessaries to the vessel under circumstances which by the local law gave them a lien on the ship. He apparently takes pains to avoid determining the question which party was under obligation by the charter party to furnish the funds to disburse the ship. If the ship was bound for the necessaries furnished that was enough for the decision of the case before him, and he decided nothing else.

Nor is there any force in the point made on behalf of the charterer that by finally satisfying the decree or by giving bond for the release of the ship the owners admitted their liability to pay the port charges, etc., or that it was a case obliging them to do so under the twelfth clause of the charter party. They had the right to protect their property without being held to such consequences of their acts in doing so; and, the decree having gone against the ship, their satisfaction of the decree has no force as an admission of any liability to the charterer under this charter party.

Nor does the exception of "fire" in the thirteenth clause aid the charterer in this case. This exception is coupled with those of the act of God, restraint of princes, etc., which are the usual exceptions inserted in bills of lading for the protection of the carrier. In some charter parties it is provided that the bills of lading shall be issued with those exceptions, and this may be their intended application in this contract as a security to the owners, additional to the guaranty contained in the instrument. In this charter these exceptions are, however, declared to extend "throughout the charter party." It may be that this language is strong enough to extend their operation to any liability or obligation of either party to which they may be reasonably applied. It is obvious, however, there must be some limit on their application, or they would in effect annul the express terms of the contract, and be inconsistent with the clear intention of the parties. It is not necessary to determine to what particular cases these exceptions will apply beyond the usual case of protection to the shipowner, if any. The question is: Do they have the effect of enlarging the specific cases in which allowance is made for lost time to the charterer by the twelfth clause, so as to bring the case of fire in the cargo causing the delay

within that specification. I think it is clear that they do not. That specification, which is very clear in its terms, cannot be modified by other doubtful clauses in the contract nor by any other provision therein, unless the intent so to modify is clear. And it surely is not so here, where the very case of accident to the cargo (and fire is such an accident) is expressly declared to be at the risk of the charterer. Whatever application they may otherwise have, they cannot reasonably be applied to alter or annul what is elsewhere in the contract expressly agreed to.

It is, however, claimed for the charterer that it was the fault of the owners alone that the ship was delayed from the 20th to the 25th of December for want of funds, and that the charterer should be allowed for these five days. On this point, however, my opinion is that by the terms of the charter party the charterer undertook to pay in the first instance all charges except those enumerated as belonging to the owners. This enumeration does not include general average expenses in a port of refuge. And there is no authority cited to the effect that as between owners and charterer the former is bound to bear these expenses in the first instance. Therefore this claim is disallowed. If by the proper application of the principles of general average any of such charges would ultimately fall on other interests, this does not affect the obligation so imposed on the charterer.

There remains still a question of equitable set-off or allowance to the charterer by reason of the fact that the owners of this ship have received in the general average adjustment a certain amount for wages and provisions during the detention at Halifax which, as between them and the charterer, they were bound to supply to the ship by the terms of the charter party as part consideration for the stipulated hire of the vessel. There is a certain plausibility in this claim, and yet I think it is not well founded. The precise question arose in the case of Howden v. Steamship Nutfield Co., Lim., 3 Com. Cases, p. 56, and was decided adversely to the charterer by Mr. Justice Kennedy. The charter party in that case provided that general average should be according to York-Antwerp rules, but I do not perceive that that circumstance is material. In every maritime adventure the parties must be deemed to contemplate as possible a general average disaster, and the York-Antwerp rules have become so generally adopted that it was fairly within the liberty given to the charterer to issue bills of lading, that they should be made subject to those rules, and within the intention of the parties that in case of a general average disaster the adjustment might be in accordance with those rules.

While it may properly be assumed that, in fixing the rate of hire in a charter party by the terms of which the owners were to pay for wages and provisions, allowance was made for these items of expense to the owner in the calculation of the proper rate of hire, yet, as pointed out by Mr. Justice Kennedy, it cannot be assumed that some certain part of the hire exactly equivalent in amount to such expense is to be paid for that particular purpose, or, as the learned justice says, the court "cannot speculatively appropriate a part of the sum paid by the plaintiffs (charterers) for the hire of the ship to the cost of wages and provisions." Various inducements and considerations may have affected the rate of hire—the market for freights, the abundant or the short supply of ships adapted to a particular trade, many general trade conditions that may raise or depress the rates of hire—and the calculation would be disturbed by the difference in the cost of provisions in different parts of the world. In making such a contract, the parties must be deemed also to have known and foreseen that, if a general average loss should happen, the owners who actually paid for the wages and provisions might be allowed for these items in the general average adjustment, and it was open to the parties, if they wished to do so, to provide that in such case there should be an equivalent or some specified allowance made to the charterers. Not having done so, and having stipulated for the hire running on without interruption in such a case, it can hardly be said that an intention to allow such a deduction from the hire should be implied from the fact that as the result of the disaster the owner may make a profit. The introduction of such a provision into charter parties would be productive of confusion and inconvenience especially where, as here, the hire is to be paid at stated times, as monthly, because if such disaster should happen the exact amount to be paid could only be determined after

long delay, and it may well be that as such profit to the owner would ordinarily be small, and possibly might not come to him at all, it was not thought worth while to introduce this uncertain element into the contract. The case last cited is not only a decision of great authority, but, on the whole, I think it is founded in reason, and, so far as it is in conflict with the later decision of Mr. Walton, now Mr. Justice Walton, in determining the general average adjust-ment in the case of the steamship Doratea, I feel bound to follow it. The opinion in the latter case, however, seems to assume that in that particular case the cost of wages and provisions as part of the hire of the vessel was or could be apportioned with certainty. But whether this was so or not I think the Howden Case gives the better and the sounder rule.

For these reasons, I am of opinion that the owners of the Hackney, and not the charterers, are entitled to the fund deposited in the Hamburg branch of the German Bank.

As the question involved admitted of some doubt, and the parties have acted in good faith in making and prosecuting their respective claims, I think each party should bear his own costs and expenses, and that the fee of the arbitrator, which is fixed at $500, should be paid one-half by each party. And I accordingly award and determine, under and by virtue of the submission to arbitration in said matter dated January 27 and November, 1902, signed by Eeles, Ruston & McMullen and by H. Vogemann, as follows:

1. That the sum of £891 13s., now on deposit in the Hamburg branch of the German Bank to the joint credit of H. Vogemann and Eeles, Ruston & McMullen, together with all interest earned and due thereon, be paid to the said Eeles, Ruston & McMullen, the owners of the Hackney, and that the said H. Vogemann give an order to that effect to said bank or to said owners.

2. That each party to this arbitration bear his own costs and expenses, and that each of said parties pay one-half of the fee of the arbitrator, which is hereby fixed at $500.

In witness whereof, I have subscribed this decision and award in duplicate at the city of New York this 5th day of August, in the year 1903.