### THE STRATHALLAN.

(District Court, E. D. New York. January 21, 1911.)

SHIPPING (§ 84*)—LIABILITY OF VESSEL—INJURY TO STEVEDORE'S EMPLOYÉ—
NEGLIGENCE OF WINCHMAN.

Under a time charter which required the vessel to furnish to the charterer the use of her steam winches for loading and discharging and to provide men to work the same, a seaman furnished by the vessel to operate a winch for stevedores employed by the charterer to load the vessel remained a servant of the vessel, which was liable for an act of negligence on his part by which an employé of the stevedores was injured.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349–351; Dec. Dig. § 84;* Master and Servant, Cent. Dig. § 492.]

In Admiralty. Action by Albert J. Aronson against the steamer Strathallan. Decree for libelant.

Stephen M. Hoye and Joseph K. Field, for libelant.

Convers & Kirlin, Charles R. Hickox, and Russell T. Mount, for claimant.

CHATFIELD, District Judge. The libelant was injured by a draft of railroad-iron rails, in the hold of the steamer Strathallan, on the 27th day of July, 1908, when he, with a number of other stevedores, was engaged in releasing the rails from the slings and stowing them in the hold. Two winches were used at the hatch in question, each operated by separate winchmen upon the deck of the steamer, while a gangwayman gave signals directly to the winchmen for the operation of the winches. The steamer had eight of these winches in operation at the time, of which six were run by the crew of the steamer and the others by the stevedore's men. The stevedores had been hired for the specific purpose of loading the vessel, and were

---

performing the loading in the ordinary way. The libelant was an employé of the stevedore.

The negligence which caused the injury was found by this court immediately after the taking of the testimony, in the following opinion:

"The libelant was standing in such a position that as the draft of rods raised he either fell or stepped astride of the draft and was injured, both on the leg and ribs, by coming in contact with the draft. He apparently struck his head as he came in contact with the tunnel, and then the draft was lowered to the floor. The starboard winch, operated by one of the stevedore's men, was used to draw the draft of rods across the deck over the hatch and to lower the draft into the hatch; the port winch having already raised the draft from the lighter to a point above the rail, and the port winch then reversing or letting its fall run out, so that the starboard winch could draw the draft as far as it was operated. The starboard winch also lifted the bridle and fall from the hold; but at the time the port winch would run forward to take up the cable, which it had let out for the accommodation of the starboard winch. The testimony shows that the port winchman, who was a sailor on the vessel, ran his winch to correspond to the movements of, and signal to, the starboard winchman after the draft had been raised to a point over the rail.

"The accident was caused by the starting of the port winch when the starboard winch had not begun to raise the bridle and fall from the hold. The bridle at the end of the draft, where the libelant was attempting to unfasten the chain, was taut, and he had not accomplished the unfastening when the draft was pulled up and to port, as well as forward under the strain from the port winch; the starboard winch not being in operation. The port winchman apparently started his winch under a mistake or careless assumption that the gangwayman (who had to signal from the side of the ship for the raising of the draft from the lighter, and then step to the coaming to signal for the handling of the draft in the hatchway) had turned away from the hatch and given an order to 'heave away.' This gangwayman testifies that he had given no signal, while the port winchman testifies that the gangwayman gave the signal.

"Inasmuch as the port winchman, even if a signal were given, should not hoist the draft without a corresponding motion on the part of the starboard winch, when the draft was in the hold (that is, in the absence of express direction for some handling of the draft), and also because the starboard winchman testifies that he did not start his engine and received no signal, it would seem that the mistake or misinterpretation of the signal must have been made by the port winchman, and that the accident was caused by the operation of the port winch, either under a mistake in interpretation or in the absence of any signal from the gangwayman: and, if the ship was liable for the actions of the port winchman, I think it should be held at fault. I see no contributory negligence on the part of the libelant because, even if his position in the hold were such that he might have been placed in some other danger, it was not negligence with respect to the immediate cause of this accident, which was the raising of the draft."

The court sees no reason to change the conclusion then made.

The claimant has, in spite of this finding, suggested that the gangwayman was at fault rather than the winchman, inasmuch as it tries to show that the witnesses Conners (page 6) and Ward (page 33) testified that, the chains having been too tight to unhook the sling, they called to the winchman for more slack. But this was considered in the previous decision. All of the other witnesses are clear upon the point that the draft started, and that the calling for slack was an attempt to have the draft lowered, to release the libelant after he was caught; and Ward's testimony, above referred to, was also to that effect, rather than as the claimant now contends.

The gangwayman was not in a position to give any signal, the starboard winch did not start and did not receive a signal, and the libelant has satisfactorily shown that the winchman made the mistake by which the libelant was injured.

As to the responsibility for the winchman's negligence, a serious question arises. Under the authority of Standard Oil Co. v. Anderson, 212 U. S. 215, 29 Sup. Ct. 252, 53 L. Ed., 480, affirming the Circuit Court of Appeals, and following the reasoning in the case of The Slingsby, 120 Fed. 748, 57 C. C. A. 52, a winchman would seem to be (so far as the manner in which he runs a winch is concerned) the servant of the owners of the steamer, if the steamer is furnishing him as winchman to do the work. The doctrine upon which the case of The Elton, 142 Fed. 367, 73 C. C. A. 467, was decided seems to be based principally upon a determination that the duty to furnish competent or suitable winchmen does not go far enough to cover a single or specific act of negligence on the part of one of those winchmen, and that the ship cannot be held liable for such a single act of negligence, on the theory of any breach of duty to furnish a suitable man.

The general trend of the cases which in the state of New York has been recently developed, following the case of Higgins v. Western Union Telegraph Co., 156 N. Y. 75, 50 N. E. 500, 66 Am. St. Rep. 537, in which the responsibility for a workman is made to depend upon whose work he may be doing—that is, whose service is being accomplished at the time—has been distinguished by the Supreme Court in such a way as to make this general proposition inapplicable to the work of the crew of a vessel, when furnished to a charterer or to stevedores under the usual provisions of a charter, such as existed in the present case.

The Strathallan was chartered, upon the 16th day of July, 1908, to Norton & Sons, for a period of one round trip to South America, under the usual form of time charter, so far as the matters with which we have to do in this case are concerned, for a lump sum per month, and contained the following provision:

"17. Steamer to work night and day if required by charterer, and all steam winches to be at charterer's disposal during loading and discharging, and steamer to provide men to work same both day and night as required, charterer agreeing to pay ordinary extra expense, if any incurred by reason of night work. In the event of short steam or a disabled winch or winches, owners to pay for shore engine or engines, in lieu thereof, if required, and to pay any loss of time occasioned thereby. Coals used for cooking, evaporating water, or for grates and stoves to be agreed as to quantity and their value allowed by owners."

At New York, Norton & Sons hired the stevedore for whom the libelant was working to load the vessel.

This is the same form of charter which has been considered by the courts in a number of cases, and the provisions of such charter are apparently the basis of the question with relation to the furnishing of a competent crew and competent men to perform particular service, such as was considered in The Elton, supra.

In the case of Constantine & Pickering S. S. Co. v. Tweedie Trading Co., 159 Fed. 706, 86 C. C. A. 574 (citing Golcar Steamship Co. v. Tweedie Trading Co. [D. C.] 146 Fed. 563; British Maritime Trust, Limited, v. Munson Steamship Line [D. C.] 149 Fed. 533; and The Santona [C. C.] 152 Fed. 516), the Circuit Court of Appeals of this circuit held that the steamer fulfilled her obligation under this clause when she tendered to the charterer men competent to work the winches. But the question there involved, and the question involved in all of the cases stated, was the obligation for the expense of operating winches, and had nothing to do with the question of negligence in the manner in which they were operated.

In the case of The Santona, supra, the court holds that the furnishing of a competent crew is all that is required so far as the furnishing of labor is concerned. But on page 518 of 152 Fed. the court says:

"Under the very ordinary form of time charter involved in this cause, it shocks knowledge common to all men acquainted with maritime business to say that the owner has surrendered the possession or control or command or navigation of his ship. But he has surrendered control of her freight and passenger capacity and handed the same over to the charterers for all lawful purposes."

It can be seen from these citations that if the winchman is to be regarded as the servant of the vessel, and the running of the winches considered as a part of the control and command of the ship, then the winchman is still the servant of the owners, and they are liable for his acts of negligence. In other words, he would not be a fellow servant and employé of the stevedores in this respect.

On the other hand, if the doctrine of The Elton, supra, were to be taken, and the only allegation of negligence to be considered were whether a competent man were supplied, then the responsibility for the winchman's actions would be terminated when he was turned over to the stevedore, if competent to do the work, and he would immediately become a fellow servant of the stevedore's man in the actual process of unloading.

As has been said, the reasoning in the Anderson Case seems to be controlling, and, until that reasoning has been applied by the appellate court to the case of a ship under charter, it would seem that the libelant is entitled to recover.

It is possible to point out a distinction of fact between the cases; but, if the matter is disposed of from the standpoint of principles rather than particular facts, no difference would seem to be interposed by the existence of the charter, and by the fact that a right to call for members of the crew to operate the winches has been transferred under the charter to stevedores hired by the charterer, instead of being given directly by the owners of the ship to stevedores who would be working for the shipowners instead of the charterers.

The man's injuries, fortunately, were not severe. He suffered substantially three months' loss of time, and more or less physical pain, arising from a severe cut upon the thigh, some broken ribs, and

a gash upon the head, which caused pain, but which ultimately disappeared. His three months' loss of time was worth substantially $180, and it would seem that a recovery of $500 would be sufficient.

The libelant may have a decree for that amount, with costs.