ARBOR SHIPPING CO., Limited, v. DE LA GUARDIA, Inc., et al.

Appeal of INTERNATIONAL PAPER CO. et al.

No. 110.

Circuit Court of Appeals, Second Circuit.

Jan. 11, 1932.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Roscoe H. Hupper, William J. Dean, and William McL. Ferguson, all of New York City, of counsel), for appellants.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Charles R. Hickox and Clement C. Rinehart, both of New York City, of counsel), for libelant-appellee.

Joseph K. Inness, of New York City, for respondent-appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, C. J.

The British steamship Ulmus was chartered to the appellee De La Guardia, Inc., on a time charter, for the period from June to October, 1927. During that time, she carried fifteen cargoes of pulpwood from Pentecoste, in the province of Quebec, to Three Rivers, Quebec, for the appellants. The contract of carriage between appellants and appellee De La Guardia, Inc., for these shipments was made April 8, 1928; the cargoes were to be loaded and discharged free of expense to the vessel, and the vessel was to be free of wharfage at loading and discharging points. Appellants were not wharfingers. The libel seeks recovery for charter hire and disbursements against De La Guardia, Inc., for which recovery was had and no appeal was taken. It also asks damages for injuries to the vessel due to careless and reckless loading by means of chutes; also damages resulting from injuries to the bilge keels, bottom plates, and other parts of the hull. These exterior injuries were charged to have been caused by providing an unsafe berth for the vessel at Pentecoste. The appellants were impleaded by De La Guardia, Inc.

Pentecoste is a village on the northern coast of the Gulf of St. Lawrence. Entry to the port is made from the gulf through a dredged channel passing between a cliff on the right and a low sand spit on the left, to and along a wharf 300 feet long and 100 feet wide, situated between the cliff and the Pentecoste river. The channel, including the berth along the wharf, had been dredged in 1924 to a width of 75 feet and to a low-water depth of 20 feet, and had been dredged again in September and October, 1925. It had been used for loading steamers since 1923, and steamers having a draft of 14 feet had occupied it.

The Ulmus arrived on June 18, 1927, for her first cargo. The depth of the channel over the sand bar was about 8 or 9 feet at low water and from 17 to 21 feet at high water. She anchored outside. A representative of the appellants showed her officers the channel marks and range lights and assisted the crew in making the soundings which they took at the bar and in the berth, and pointed out to them the condition of the wharf. They considered the berth safe for the Ulmus. She was the largest steamer to have docked there, being 314 feet long, 47 feet beam, and about 23½ feet deep. After receiving cargo forward, on the next high tide she was turned in the berth abreast the wharf so that she lay bow out and port side to the wharf. She then received her additional cargo and sailed at high tide so as to clear the bar. Thereafter each time she docked at the wharf she took soundings and found the water from 18 to 24 feet deep at the outer end, 12 feet at the middle, and 5 feet down to nothing at the inner end of the berth. The bottom of the berth consisted of clay and sand which was visible through the water. Occasionally, when the vessel lay with her bow inshore while loading, her bow would touch the bottom for a short time, but this would not occur if loading stopped during the middle flood tide. Oftentimes it did not touch bottom, and it was asserted and denied that her stern always kept afloat.

The master of the vessel gave directions as to how deep the ship was to be loaded, and he determined the size of the cargo. She loaded from 13½ feet forward to 16½ feet aft on her various voyages.

The cargo was received from chutes which projected from a trestle equipped with a conveyor system. Other and safer methods were known and could have been used—one, lowering sling loads of pulpwood into the vessel's holds by the ship's winches and booms; another, loading by conveyors and chutes arranged so as to dump the pulpwood into the holds; a third was by the use of flumes. The use of slings was slower and

more expensive, but safer. When loading, the outboard ends of the chutes would come close to the vessel's hatch coamings at high tide, but at low tide the vertical distance from the ends of the chutes to the vessel's deck would be from 9 to 12 feet. The distance from hatch coamings to the tank tops at the bottom of the holds was about 24 feet and to the top of the shaft tunnel about 18 feet. Billets of pulpwood, 4 feet long and about 15 inches in thickness, fell from the chutes directly upon the tank tops and, in the aftholds, also upon the shaft tunnel. Sometimes they came down the chutes fast and struck the hatch coamings or the vessel's decks. After the bottoms of the holds were covered with billets further damage was caused by wet billets bounding and striking against the sides, frames, ladders, and other parts of the vessel. This damage was repaired at a cost of about $5,000; $685 for repairing damages to the deck, and about $1,500 for damages to the shaft tunnel. The chief engineer and chief officer protested against this method of loading. The master was under no duty to do more, for he was not obliged to interfere with the loading of the vessel, nor was he required to withdraw her from the charter service. Cornec v. B. & O. R. Co., 48 F.(2d) 497 (C. C. A. 4); British Maritime Trust v. Munson S. S. Line (D. C.) 149 F. 533. The appellants elected to use a dangerous method which resulted in careless loading and injury to the ship, when a safer one might have been used. The court below very properly imposed liability for the damages to the deck and the inside of the vessel.

The bottom damage is charged to have been caused by the berth at Pentecoste. On her 15 dockings at the berth, the Ulmus maneuvered in the same general manner. Each time the officers took soundings. Sometimes the clear water made it possible to see the bottom. At no time were boulders or other obstructions found in the berth. Nor at any time did either the appellants' superintendent or the ship's officers find anything to warrant a belief that the bottom was dangerous. Nor was any complaint made by the officers of the vessel regarding the berth.

On September 23, 1927, a survey was made of the bottom, at Quebec, and such damage as was then found to have occurred to the bottom was not charged as resulting from an unsafe berth. A survey, made in November, 1927, at Montreal, showed additional damage to the bottom than that found on the Quebec survey. But no claim for bottom damage was asserted until May, 1928. On October 25, 1927, a claim for damage inflicted in loading was filed against the appellants and at that time no bottom or port bilge keel damages were claimed, although such damages were known in September, 1927, when the ship was dry-docked. Nothing in the log up to October 25, 1927, suggested grounding at the berth which would have caused the bottom damage. The log shows that on October 25, 1927, the steamer was "grinding heavily alongside wharf owing to strong ebb tide and current. 8:15 p. m. Felt heavy lurch, as though vessel relieved from obstruction." There was substantially the same occurrence in September, 1927. What this was due to is not disclosed. It may have been that the mooring lines were not properly adjusted in view of the conditions of the current, tide, and wind. If the vessel was held closely against the wharf by the wind and tide and there was a slackening of the lines, a lurch such as described might have been caused. This would not be the fault of the consignee. When the vessel dry-docked in Montreal, November 3, 1927, a protest was made, under date of November 4, signed by the captain and second officer, which described the grinding heavily alongside the wharf on October 25, 1927, and that the steamer took a heavy roll as though released from some obstruction, but there is no suggestion that appellants were blameworthy. At the time of the lurch, the vessel had a heavy list to port and a cracking noise was heard as though something had been torn from the ship's side. This does not explain the bottom damage found.

The bilge keel damage was found when the ship dry-docked in Quebec on September 23, 1927. One of the surveyors said this could have been caused by hitting a submerged object, and, because the bilge keel was ripped from forward to aft and protruded 9 or 10 feet, it indicated the vessel was in motion when the damage occurred. The log entry shows that this injury was first discovered on September 21, 1927. It reads: "11:15 a. m. Struck object, stopped ship; noticed bilge keel damaged. SS returned." But it was found below that this damage must have resulted on the occasion when the cracking noise was heard by one of the officers as the steamer was lying alongside the Pentecoste wharf. It all rests upon inference. It is not supported by sufficient proof to justify the claim that the berth had obstructions or submerged spiles.

It appears that there projected from the wharf and extended diagonally along its face from a point above low water at the inner end to a point below the water at the outer end, a one-foot wooden shelf which marked the place where there was new construction. This was open to view and was called to the attention of the ship's officers. Fenders were used to prevent the vessel coming up against it. The chief officer testified that on one of the trips, he saw a broken spile sticking out about a foot outside the wharf, and that his complaint about this spile led to doubling the width of the bumpers between the ship's side and the wharf. It remained for the ship's officers to keep the vessel a proper distance away from the wharf, and, if by chance they failed to do so, it gave no right of recovery against the appellants.

On July 13, 1927, the ship grounded on a sand spit near the channel where there were some boulders. What damage was caused is not disclosed. Surveyors advanced theories as to the cause of the injury which excluded bottom damage due to a foul berth. The fact that she had grounded at one time on the sand spit where there were boulders does not permit our holding the appellants for this bottom and bilge damage. If we did, the liability would be imposed from inferences alone. The absence of a record in the log reporting the damages found by the surveyor as caused by some obstruction in the berth argues strongly against appellee's claim. Scottish Nav. Co. v. Munson S. S. Line, 10 F. (2d) 708 (C. C. A. 2).

Moreover, on various trips made by the vessel, the officers took their own soundings, became familiar with the berth, wharf, and surroundings, and accepted it as satisfactory for the purpose of loading cargo. This justifies the conclusion that they knew the conditions as well as they might have been ascertained. In any case, there was no suggestion of lack of warning of any obstruction in the berth. U. S. Trucking Corp. v. City of New York, 18 F.(2d) 775 (C. C. A. 2). The burden of proof rested upon the appellee to establish a foul berth, and it must be sustained by proof and not rest upon inferences only. Newtown Creek Towing Co. v. Astoria, etc., Co., 47 F.(2d) 578 (C. C. A. 2); Stevens v. Maritime Warehouse Co., 263 F. 70 (C. C. A. 2); Peterson v. Great Neck Dock Co. (D. C.) 75 F. 683.

The decree will be modified allowing recovery for deck and inside damage to the vessel only.

Decree modified.